## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COLUMBIA

| | | |
|---|---|---|
| HALLINE OVERBY and | ) | |
| PAULETTE M. OVERBY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| NATIONAL ASSOCIATION OF LETTER | ) | Case No. 06 CV-1356 (RMC) |
| CARRIERS, NATIONAL ASSOCIATION | ) | |
| OF LETTER CARRIERS ANNUITY | ) | |
| TRUST FUND, WILLIAM H. YOUNG, | ) | |
| and BOARD OF TRUSTEES of the | ) | |
| NATIONAL ASSOCIATION OF LETTER | ) | |
| CARRIERS ANNUITY TRUST FUND, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### PLAINTIFFS' PROPOSED FINDINGS OF FACT

Stephen R. Bruce (DC Bar No. 289066)
Allison C. Pienta (DC Bar. No. 494372)
805 15th St., NW, Suite 210
Washington, DC 20005
Telephone: (202) 371-8013
Facsimile: (202) 371-0121

Attorneys for Plaintiffs

**Table of Contents**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    The NALC and the Annuity Trust Fund (ATF) . . . . . . . . . . . . . . . . 1

      B.    The Survivor Annuity Provided by the ATF . . . . . . . . . . . . . . . . . . . 2

      C.    The Overbys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      D.    The Denial of the Survivor Annuity for Mrs. Overby and
            Commencement of this Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.   Claim 1:  ERISA's Anti-Cutback Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.  Claim 2:  Ineffective Adoption of Amendment. . . . . . . . . . . . . . . . . . . . 19

      A.    Was the "Proposed Amendment" Submitted to the Fund's
            Actuary for an Evaluation and Estimate of Its Cost? . . . . . . . . . . . 20

      B.    Did the Trustees "Adopt" a Written Amendment to Eligibility
            for the Survivor Annuity at the April 19, 1985 Meeting? . . . . . . . . 22

      C.    Did the NALC Executive Council "Approve" an Amendment
            to Eligibility for the Survivor Annuity at the May 15, 1985
            Meeting? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

IV.   Claim 3:  Ineffective Amendment Without Summary of Material
      Modification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

V.    Claim 4:  The Untimely and Misleading Summary Plan Description. . . . 54

VI.   Claim 5:  No Disclosure of Ways to Protect the Survivor's Benefit
      as Required by *Eddy*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

i

**Introduction**

Plaintiffs respectfully request that the Court adopt the following Findings of Fact based on the evidence presented at trial:

1.     The Court held a three-day bench trial in this case on June 10, 11 and 16, 2008, with eight witnesses for the Plaintiffs, two of whom were adverse, and one live witness for the Defendants.  Plaintiffs offered the deposition testimony of three additional witnesses and Defendants offered the videotaped depositions of two additional witnesses.  Seventy-nine exhibits were introduced.

**I.     Background**

**A.     The NALC and the Annuity Trust Fund**.

1.     The National Association of Letter Carriers ("NALC") is a labor union which represents city delivery letter carriers employed by the United States Postal Service. The NALC is the sponsor of a retirement plan called the Annuity Trust Fund ("ATF").

2.     The ATF covers the NALC's national officers, national business agents, certain branch officers, headquarters employees and employees of the NALC's Health Plan. Ex. 27 at P 130.

3.     At the end of 2004, the ATF had approximately 581 active participants and 376 annuitants.  L.R. 16.5 Jt. Pretrial Statement (dkt.#24) at 1-2.

4.     The President of the NALC serves as the Plan administrator for the ATF. Ex. 56 at P 424 and Ex. 57 at P 74.

5.     The Board of Trustees of the NALC consists of three members of the NALC who the union membership elects to carry out certain responsibilities under the NALC Constitution. The Board of Trustees has oversight responsibilities for four entities: The NALC itself, the NALC Health Benefit Program, the NALC Life Insurance Program, and the Annuity Trust Fund. Ex. 55 at 41 and Ex. 70 (article in April 2008 *Postal Record*, official magazine of the NALC, on the Board of Trustees).

6.     The NALC Executive Council is a 28-member body consisting of the national officers, national business agents, and the three members of the Board of Trustees.  Ex. 55 at 42.

7.     Under the Plan document which governs the ATF, the Board of Trustees of the NALC has the authority to adopt amendments to the ATF. Any proposed amendments must be evaluated by the ATF's actuaries and after adoption by the Board of Trustees must be approved by the NALC's Executive Council. Ex. 1 at P 92.

**B.     The Survivor Annuity Provided by the ATF.**

8.     One of the benefits the Annuity Trust Fund offers is a surviving

spouse benefit equal to 60% of the participant's accrued benefit, with no reduction to the participant's annuity. Ex. 1 at P 87.

9.    The parties agree that under the ATF Plan document in effect until May 15, 1985, the surviving spouse was the "one to whom the Annuitant was married for at least one year immediately preceding the Annuitant's death, or is the parent of issue by such marriage." Ex. 1 at P 87.  For reference, the parties have agreed to refer to this as the "one-year-at-death" rule.

10.    The Civil Service Retirement System ("CSRS") has a similar rule which can apply to marriages after retirement except there is an actuarial reduction associated with the survivor benefit.  See Tr. (6/12/08) 33-1 to 17; Tr. (6/16/08) 33-16 to 34-4; Ex. 22.

11.    Although the legality and bona fides of the provision are disputed, the parties do not dispute that at some time between 1985 and 1989, the Plan Description for the ATF was changed to provide for different eligibility requirements for the survivor annuity. Article V, Section 1(b) of the Plan, now states:

> "[T]he surviving spouse (if any) is eligible for an Annuity of 60% of the Annuity being paid to the Annuitant at the time of death, provided that the spouse is one to whom the Annuitant was married for at least the year immediately preceding and ending on the Annuitant's annuity commencement date, or is the parent of issue by such marriage.

3

> Notwithstanding the foregoing, if the Annuitant and the spouse were married within the year before the annuity commencement date and were married for at least one year ending on or before the Annuitant's death, that spouse shall be paid the Survivor Annuity as if the spouse and the Annuitant had been married for the year ending on the annuity commencement date."

Ex. 16 at NALC 34.  For reference, the parties have agreed to refer to this as the "marriage-at-commencement" rule.

### C.    The Overbys.

12.    Plaintiff Halline Overby was born in 1920 and was first employed as a letter carrier in 1960.  Tr. (6/11/08) 14-19 to 23 and 15-21 to 23.

13.    In 1969, Mr. Overby was elected President of Local 24 of the National Association of Letter Carriers in Los Angeles. Tr. (6/11/08) 16-5 to 17.

14.    In 1978, Mr. Overby was elected to be one of the three trustees on the NALC's Board of Trustees. He served in that capacity from 1978 to 1981. Tr. (6/11/08) 17-19 to 19-17.  He served as Chairman of the Board of Trustees during his final year.  L.R. 16.5 Jt. Pretrial Statement (dkt.#24) at 33, ¶1.

15.    In April 1981, Mr. Overby was appointed Assistant Secretary-Treasurer of the NALC. He was elected to that office in 1982 and continued in that capacity until October 1990. Tr. (6/11/08) 19-13 to 20-6.  During the period from April 1981 forward, Mr. Overby worked at NALC headquarters in Washington D.C. as a resident national officer. Tr. (6/11/08) 20-13 to 16.

4

16.     As a trustee and then a national officer from 1978 to 1990, Mr. Overby was a member of the NALC Executive Council. Tr. (6/11/08) 48-2 to 11. For almost 20 years, continuing after his retirement, Mr. Overby served as the NALC's representative on the Muscular Dystrophy Association.  Tr. (6/11/08) 58-19 to 59-10.

17.     Mr. Overby met Paulette Motayne in 1980.  She was a bank teller at National Savings and Trust Bank at the time she met him. They began living together in 1982.  Tr. (6/11/08) 83-21 to 85-6. Paulette started working for the NALC Health Plan in October 1982 and continues to be employed as a clerk in the control department today. *Id*. at 84-8 to 22. The Overbys were married on May 30, 1991 and have been married for over 17 years. *Id*. at 85-17 to 86-5.

18.     Mr. Overby has been a participant in the NALC Annuity Trust Fund since 1978.  Tr. (6/11/08) 18-22 to 25.

19.     Mrs. Overby has also been a participant in the NALC Annuity Trust Fund since 1982 because of her employment with the NALC Health Benefit Plan. Tr. (6/11/08) 84-23 to 25.

20.     Although Mr. Overby had 34 years of service as a letter carrier, branch president and national union officer, L.R. 16.5 Jt. Pretrial Statement at 2, his retirement benefits from the ATF are based on his 12 years and 5 months as a

5

national union officer between 1978 and 1990. Based on that service, his monthly benefit is $2,936. Ex. 20.

21.    The annuity for the surviving spouse of Mr. Overby was also computed in December 1990 as $1,762 per month. Ex. 20 at P 26.

22.    Like many branch officers and business agents, Mr. Overby knew the rules for survivor's benefits under the Civil Service Retirement System because the CSRS provides retirement benefits for his years of employment as a letter carrier. Tr. (6/11/08) 27-17 to 28-1 and 78-5 to 79-1. Branch officers and business agents have responsibilities for answering questions from union members and their spouses about the CSRS. Tr. (6/12/08) 23-16 to 24-19 and 45-14 to 46-5 (testimony of John Marco and Lawrence Hutchins).

23.    In May 1986, when he was age 65, Mr. Overby suffered a stroke. Tr. (6/11/08) 21-8 to 22-5 and 85-7 to 8. Although he substantially recovered through therapy, he continued to suffer limitations in his speech and mobility. Tr. (6/11/08) 22-6 to 23-15. Because of those issues and his age, Mr. Overby did not seek re-election to his position as Assistant Secretary-Treasurer of the NALC in 1990. His term of office ended in December 1990. Tr. (6/11/08) 23-8 to 18 and 86-10 to 16.

24.    The payment of Mr. Overby's retirement benefits from the Annuity Trust Fund commenced on February 1, 1991, when he was age 70½. Ex. 20.

25.    Before he moved to Washington from Los Angeles in 1981, Mr.

Overby had separated from his wife, Lucille Overby. Tr. (6/11/08) 20-13 to 21.

Both he and his wife initiated divorce proceedings in 1990 in Virginia and

California, respectively. Ex. 105a and 107. The divorce in Virginia became final in

August 1990. Ex. 105e.

26.    After living together for close to nine years, Mr. Overby married

Paulette Motayne on May 30, 1991. One of the reasons they decided to marry was

that it would ensure Paulette's financial security by providing benefits like

survivor's benefits and life insurance. Tr. (6/11/08) 25-21 to 26-8 and 85-11 to 16.

27.    Mr. Overby's property settlement with his former wife Lucille

Overby was signed on January 6, 1992. It provided that Mr. Overby would keep

all of his employee benefits including the pension with the National Association of

Letter Carriers and that Lucille Overby would keep all of her employee benefits

including a pension from Pacific Bell. Lucille Overby received a portion of Mr.

Overby's retirement benefits and survivor benefits from the United States Postal

Service/Civil Service Retirement System. Ex. 107b and Tr. (6/11/08) 27-8 to 29-

22.

28.    The parties stipulate that at the time Mr. Overby was working out his

property settlement in 1991, his understanding of the survivor annuity rule under

the ATF was that the survivor annuity would go to his spouse at the time of the annuitant's death.  Tr. (6/11/08) 30-23 to 32-11 and Tr. (6/12/08) 120-6 to 121-16 (confirming the stipulation).

29.    An October 4, 1991 letter from Mr. Overby's divorce attorney to his ex-wife's attorney stated Mr. Overby's understanding that "The pension plan to which you make reference [the ATF] in fact has survivors benefits–but only to the then spouse."  Ex. 21.  Mr. Overby also testified that his understanding at that time, based on conversations with other officers and NALC staff, was that the spouse "should be married to you at least a year before your death and that the annuity would go to the spouse at the time of death."  Tr. (6/11/08) 32-16 to 33-8.

**D.    The Denial of the Survivor Annuity Eligibility for Mrs. Overby and Commencement of this Lawsuit**.

30.    After their marriage in May 1991, Mr. Overby changed the designations for his life insurance and survivor's benefits from Lucille Overby to Paulette Overby to the extent his property settlement did not otherwise direct.  Tr. (6/11/08) 34-1 to 24. In February 1992, the U.S. Office of Personnel Management approved Mr. Overby's application "to provide a survivor annuity benefit for a spouse you married after retirement." Ex. 22 at  P 191.

31.    The ATF did not have a procedure for designating the surviving

8

spouse prior to death. Instead, the "Application for Retirement or Survivor Annuity" provided that the surviving spouse would fill out the Application after the participant's death. Exs.19 and 37.

32.     In June 1999, the Assistant Plan Administrator for the ATF mailed a form requesting that Mr. Overby and others update their beneficiary information. In response to that form, Mr. Overby listed Paulette Overby as his beneficiary. Ex. 24; Tr. (6/11/08) 34-17 to 35-8.

33.     After Mr. Overby again became ill again in the late 1990's, Mrs. Overby became concerned about her eligibility for the NALC's life insurance eligibility.  She spoke to NALC President Bill Young in 1998 and 2002 about checking the life insurance documents to be sure that the change in designation of the beneficiary from Lucille Overby to her had been properly recorded. Tr. (6/11/08) 90-5 to 91-5.

34.     On or about February 2003, Mrs. Overby went to the NALC's accounting office to ask about an unrelated matter concerning the tax withholding from Mr. Overby's pension. While there, she asked about the life insurance beneficiary designation.  Although Mrs. Overby did not ask about the survivor's annuity, Lisa Weir, a senior accountant at the Health Benefit Plan who has some responsibilities for the Annuity Trust Fund, misunderstood Mrs. Overby's

question and told her that she was not eligible to receive the survivor's benefit under the ATF.  Tr. (6/11/08) 91-7 to 20.

35.     The following day, Ms. Weir telephoned Mrs. Overby to confirm that she was not eligible for a survivor's annuity because she was not married to Mr. Overby when he retired.  Tr. (6/11/08) 91-21 to 92-3.

36.     Mrs. Overby testified that she was shocked and upset when she heard that she was not eligible for the survivor's benefit.  Tr. (6/11/08) 92-4 to 7.

37.     Both Mr. and Mrs. Overby testified that up until that time their understanding was that Paulette would be eligible for a survivor's annuity under the ATF based on the "one-year-at-death" rule.  Tr. (6/11/08) 32-16 to 25 and 87-10 to 88-3.

38.     Mrs. Overby telephoned William Young, President of the NALC and Plan administrator of the NALC Annuity Trust Fund, and spoke to his assistant, Linda Giordano, who assured her that she was eligible.  Tr. (6/11/08) 92-4 to 21.

39.     Mr. Young responded to the telephone inquiry with a letter to Mr. Overby dated February 7, 2003.  Ex. 30. The letter states that Mrs. Overby is not eligible for a survivor annuity because the marriage "occurred after you commenced your retirement."  The letter attaches a memorandum from Richard LaFollette, the Assistant Plan Administrator, citing the "marriage-at-

10

commencement" rule in Article V, Section 1(b) of the Plan. Mr. Young's letter stated that he was checking with legal counsel "to determine if there is any flexibility in this regulation" and would call "once [he] received that legal advice." Ex. 30.

40.    The Overbys met with Mr. Young in person to discuss this issue. Mr. Young had just replaced Vincent Sombrotto as the NALC's President and the Plan administrator for the ATF in December 2002. Tr. (6/16/08) 7-21 to 8-5. Mr. Young informed the Overbys that he had not even known that the "marriage-at-commencement" rule existed until this came up.  Tr. (6/11/08) 44-2 to 22 and 94-12 to 24.

41.    After the conversation with Mr. Young, Mr. Overby contacted Vincent Sombrotto, the former President of the NALC and former Plan administrator of the Annuity Trust Fund. Mr. Sombrotto told Mr. Overby that he adopted the amendment in his capacity as Plan administrator. Tr. (6/11/08) 44-23 to 46-8.  At his deposition, Mr. Sombrotto denied this, stating that "the executive council decided" to make the change. Ex. 52 (Sombrotto Depo.) 44-17 to 45-13.

42.    Mrs. Overby spoke to the Assistant Plan administrator, Rick LaFollette, about her denial of eligibility.  Mr. LaFollette did not ask whether Mrs. Overby knew about the "marriage at commencement" rule as an ATF participant

11

herself.   Tr. (6/11/08) 95-20 to 25. Instead, he told her that "someone should have pulled him [Mr. Overby] over in the hallway at headquarters and tell him to marry his common law wife."  *Id*. at 94-25 to 95-10.

43.     The life insurance issue was eventually resolved.  On February 21, 2003, Mr. Overby received a letter stating that he had filled out the "incorrect form."  Ex. 63 (P 19). Mr. Overby submitted the correct form designating Paulette as his beneficiary on February 28, 2003.  Ex. 63 (P 20).

44.     In a letter dated March 29, 2003, Mr. and Mrs. Overby requested review of the denial of survivor's coverage. Ex. 31.

45.     The March 29, 2003 letter from the Overbys stated their belief that Mrs. Overby was eligible for the survivor's benefit based on the Summary Plan Description for the ATF, as amended through December 31, 1999.  Ex. 31 and Tr. (6/11/08) 96-3 to 97-11.  The SPD states that if an annuitant was married less than a year before the annuity was commenced, the spouse "must be married to you" for "at least a year as of the date of death."  Exs. 26 and 31.

46.     Mr. Overby's appeal was considered at a trustees' meeting on April 23, 2003. Ex. 32.  Mr. Young testified that he was told before that meeting by Mr. Sombrotto and by outside counsel, Ms. Babette Ceccotti, that "the government" had required this rule to be changed because of "the women stealing the annuity of

the spouses, spouses stealing the annuity of older participants." Tr. (6/16/08) 47-15 to 25; see also *id*. at 27-25 to 28-9 (the law required the change because "there was some fear in the government about young women marrying older fellows and then stealing their annuities"); *id*. at 34-16 to 20 (the law "required us to make this change ... because the government was concerned about younger women taking older men's pensions").

47.    Ms. Rachelson, the outside counsel who made the presentation to the trustees in April 1985 about replacing the one-year-at-death rule, testified that the rule was not changed because of any concern about "younger mates coming in and taking the pensions of retirees." Tr. (6/12/08) 160-1 to 17.

48.    Lawrence Hutchins, a National Business Agent from 1978 to 1986 and the NALC's Vice President from 1986 to 1994, and John Marco, a National Business Agent from 1977 to 1994, both testified that they did not recall any discussion that a rule needed to be changed because of younger women stealing the pensions of retirees. Tr. (6/12/08) (Hutchins) 45-5 to 9 and Tr . (6/12/08) (Marco) 29-18 to 21.

49.    At trial, Mr. Young admitted that he and the other trustees never considered the language in the 1999 SPD when they reviewed the Overbys' appeal. Tr. (6/16/08) 49-11 to 50-5.

13

50.    In a letter dated May 7, 2003, Mr. Young advised the Overbys that their appeal had been denied and Mrs. Overby was not entitled to a survivor's annuity under the "marriage before commencement" rule. He said that he regretted that "the decision regarding survivor benefits cannot be a favorable one." Ex. 33 at P 7.

51.    After the denial of his claim in May 2003, Mr. Overby collected letters from each of the three trustees of the NALC Annuity Trust Fund at that time, George Davis, James Souza and James Worsham, and from five other individuals who had been members of the Executive Council at that time: John Marco, Lawrence Hutchins, Robert Buntz, Paul C. Davis and Eugene McNulty. Ex. 34.

52.    The letters from the former trustees and Executive Council members said that no amendment to the surviving spouse rule was presented for a vote by the trustees during the Annuity Trust Fund meeting on April 19, 1985 or for a vote by the members of the Executive Council in the meeting on May 15-16, 1985. Ex. 34.

53.    In a February 8, 2006 letter, Plaintiffs' counsel requested reconsideration of the denial of the Plaintiffs' claim based on the letters that Mr. Overby had collected. Ex. 65.

14

54.    Defendants have offered no evidence that the Plan administrator or current trustees ever investigated Plaintiffs' claim in light of these letters. Mr. Young testified that he did not see the letters until sometime after the depositions of James Worsham and George Davis, which occurred in May and June of 2007. Tr. (6/16/08) 50-22 to 51-8 and 70-13 to 71-3.

55.    The Overbys commenced this lawsuit in August 2006.  Mr. Overby testified about how it was difficult for him to file the lawsuit given his history with the NALC and the longtime relationships he knew he was likely to lose. Tr. (6/11/08) 57-15 to 24.

56.    Shortly after the lawsuit was filed, NALC President Bill Young sent Mr. Overby a letter removing him from his position as the NALC's representative to the Muscular Dystrophy Association.  Tr. (6/11/08) 59-6 to 19.

57.    Since the lawsuit was commenced, there have also been oral communications originating from Mr. Young to the Overbys suggesting that the NALC life insurance for Mr. Overby has been cut from $100,000 to $50,000. Tr. (6/11/08) 58-5 to 18. At trial, Mr. Young admitted that this would be inconsistent with the terms of the NALC Life Insurance Program and said that "any inference that we did this out of vengeance or something is just wrong." Tr. (6/16/08) 59-21 to 61-25.

15

58.     Two of the individuals who testified spoke about how difficult it was for them to testify on the opposite side from the union for which they worked almost all of their lives and to which they remain loyal. See Tr. (6/11/08) 132-5 to 16 (Souza) and 184-7 to 22 (Edgemon). As described below, one of those individuals (Mr. Souza) testified about a threat and a retaliatory action taken against him by President Young. PFF ¶¶87-88.

## II.     Claim 1: ERISA's Anti-Cutback Rule.

59.     The Annuity Trust Fund's provisions for surviving spouse benefits offer a 60% survivor's benefit with no reduction to the participant's annuity. Ex. 1 at P 87. This is a valuable optional form of benefit which benefit professionals describe as "subsidized" because there is no actuarial reduction associated with the option. Tr. (6/12/08) 129-15 to 130-1 and 165-24 to 166-22.

60.     When Mr. Overby retired, his benefits were computed as $2,936 per month with a surviving spouse's benefit of $1,762 per month.  Ex. 20.

61.     The purported amendment to the survivor annuity rule caused surviving spouses to no longer be eligible if the spouse married the participant after the participant commenced his or her annuity–no matter how long they have been married as of the date of the participant's death. Compare Ex. 1, Article V, Section 1 at P 87 with Ex. 16 at NALC 34.

62.     The minutes of the April 19, 1985 trustees meeting indicate that to the extent any amendment to the survivor annuity rule was presented to the trustees, it was presented as a change "required" by the Retirement Equity Act of 1984 ("REA"), P.L. 98-297, to maintain the Plan's qualified status.  Ex. 8 at P 325.

63.     Jani Rachelson is a partner with the firm of Cohen, Weiss and Simon. She served as outside counsel to the ATF at the time of the alleged 1985 amendment to the survivor annuity rule.  Tr. (6/12/08) 96-7 to 97-18.  Ms. Rachelson attended the April 19, 1985 trustees' meeting and took notes.  Tr. (6/12/08) 102-18 to 103-5.

64.     At her deposition, Ms. Rachelson testified that she does not recall "any consideration" of "preserving" the old rule and said that the trustees "might not have understood" the change and that it was "completely irrelevant" what they recall.  Ex. 50 (Rachelson Depo) 63-9 to 19; 70-8 to 17; 94-6 to 9. At trial, Ms. Rachelson admitted that the REA did not require the plan to "subtract" eligibility based on the  one-year-at-death-rule. Tr. (6/12/08) 122-21 to 25. She testified that REA only required the "addition" of a survivor's annuity for the spouse at the time of retirement.  *Id*. at 123-7 to 11 and 125-16 to 20.

65.     Ms. Rachelson testified that she does not recall any consideration of whether elimination of eligibility based on the one-year-at-death rule violated

17

ERISA's protection of accrued benefits.  Tr. (6/12/08) 154-21 to 155-17 and 157-3 to 11.

66.    Ms. Rachelson was also asked about a provision in Article IX, Section 2 of the Plan which prohibits adoption of an amendment "that operates to reduce the vested rights of any Participant, former Participant, or Annuitant." Ex. 1 at P 92. She testified that she does not recall any consideration about the effect of that provision. Tr. (6/12/08) 154-3 to 20.

67.    The former Plan administrator, Mr. Sombrotto, and the current Plan administrator, Mr. Young, both admitted that the elimination of the "one year at death" rule was a benefit "reduction."  Neither Mr. Sombrotto nor Mr. Young could remember any other reduction to the benefits offered under the ATF than this one. Ex. 52 (Sombrotto Depo.) 79-13 to 81-3; Ex. 53 (Young Depo.) 63-12 to 64-3 and Tr. (6/16/08) 38-22 to 39-7. At trial, Mr. Young said that he doesn't agree that this "would in certain circumstances be a reduction in benefits." Tr. (6/16/08) 33-16 to 23. He later modified that to say he believed this was a "potential reduction to people that would get married after they retired," but not a reduction for "an average employee." Tr. (6/16/08) 36-2 to 9.

68.    One of the questions on the official 1984 and 1985 Form 5500 Annual Return/Reports, which must be answered under oath, is "Does any

18

amendment result in the reduction of the accrued benefit of any participant under the plan?" See Ex. 13.  Defendants have not produced the Form 5500 for the Annuity Trust Fund which covers the April-May 1985 time period.  Ex. 41, Request No. 9. This Court has ruled that an adverse inference can be drawn from Defendants' failure to produce the Form 5500 that Defendants' response to this question was "Yes" or that the answer to the question was left blank to avoid giving an answer under oath. Tr. (6/11/08) 6-12 to 8-14.

**III.    Claim 2: Ineffective Adoption of Amendment.**

69.    Article IX, Section 1, of the NALC Annuity Trust Fund Plan Rules and Regulations, provides that:

> "The provisions of the Plan may be amended at any time by the Board of Trustees provided that the Trustees shall submit such proposed amendments to the Fund's Actuary for an evaluation and estimate of its cost, and adoption of amendments by the Trustees shall be subject to the approval of the Executive Council of the NALC."

Ex. 1 at P 92.

70.    Under Article IX, Section 1, an amendment to the Annuity Trust Fund is not effective under this provision unless:

(1)    The "proposed amendment" is submitted to the Fund's Actuary "for an evaluation and estimate of its cost";

(2)    The amendment is "adopted" by the Board of Trustees; and

19

(3)    The amendment is "approved" by the Executive Council of the
NALC.

**A.    Was the Proposed Amendment Submitted to the Fund's Actuary
for an Evaluation and Estimate of Its Cost?**

71.    Article IX, Section I of the Plan Description provides that any
"proposed amendments" must be submitted to the Fund's Actuary "for an
evaluation and estimation of its cost" prior to adoption and approval. Ex. 1 at P 92.

72.    At trial, Ms. Rachelson testified that she "can imagine some reasons"
for eliminating the survivor annuity based on the then-existing one-year-at-death
rule, "including the extreme expense of providing for two types of survivor
benefits": namely, benefits under both the new "marriage at commencement" rule
and the "one year at death" rule.  Tr. (6/12/08) 129-1 to 130-1; see also id. at  113-
4 to 11 ("It would be expensive to provide both benefits"). She later admitted that
she could not remember any discussion of such expenses and that "one could write
a plan" with a "non-duplication provision" to avoid providing "two benefits to two
survivors." *Id*. at 131-12 to 25 and 162-8 to 12.

73.    Ms. Rachelson also admitted that no actuarial evaluation of the
changes to the survivor annuity rule took place before the April 19, 1985 trustees'
meeting.  Tr. (6/12/08) 153-12 to 19. She further admitted that she is not aware of
any actuarial evaluation of the cost of not eliminating the one-year-at-death rule

20

that has taken place since that time, including any evaluation of the number of people affected since 1985. *Id*. at 130-2 to 131-7.

74.     There is no evidence that the "subtracting" of the plan's existing survivor's benefit was required for cost reasons.  Each of the three trustees, Mr. Davis, Mr. Worsham and Mr. Souza, testified that the ATF was "overfunded" at the time of the purported amendment to the survivor annuity rule.  Ex. 48 (Davis Depo.) 52-17 to 53-6; Ex. 49 (Worsham Depo.) 59-7 to 20; Tr. (6/11/08) 123-2 to 124-10. Mr. Souza testified that the Fund's actuaries told him "We could never spend the money that we currently have."  Tr. (6/11/08) 123-24 to 124-1.  Another Executive Council member, John Marco, recalled the plan being overfunded at that time.  Tr. (6/12/08) 18-8 to 19-13 and 25-5 to 26-11. See also Ex. 61 (March 5, 1987 ATF minutes on "overfunding of the Plan" and resulting improvement of benefit formula to 4% of pay). Ms. Rachelson and NALC President Young concurred that the Annuity Trust Fund was "overfunded" in the 1980's. Tr. (6/12/08)(Rachelson) 153-12 to 19 and Tr. (6/16/08)(Young) 33-6 to 15.

75.     The minutes of the April 19, 1985 meeting further show that the trustees were given a choice between a more or less costly option associated with a new survivor's benefit for deferred vested employees (which was separately required by ERISA §205(a)(2), as amended by REA). The minutes state that the

trustees were told that the ATF could offer the existing 60% benefit on an unreduced basis to this new group of surviving spouses, or that this "REA - new survivor benefit" could be limited to 50% of the participant's annuity and could be subject to an actuarial charge to cover the cost of the benefit. Ex. 8 at P 325-26.

76. The minutes show that the trustees elected the most generous and costly option. *Id*. This is consistent with Mr. Worsham's testimony that the plan was overfunded at the time and that during his tenure from 1981 to 1994 the trustees never approved a benefit reduction. Ex. 49 (Worsham Depo) 32-2 to 34-22.

77. The requirement in the amendment procedure for an actuarial evaluation and estimation of costs of a proposed amendment was not one the trustees had a custom or practice of ignoring. The minutes of the April 19th meeting and the minutes of the December 5, 1985 meeting both describe how the Fund's Actuary evaluated the other changes to the ATF's benefits. Ex. 8 at P 324-26 and Ex. 12 at NALC 701.

**B.    Did the Trustees "Adopt" a Written Amendment to Eligibility for the Survivor Annuity at the April 19, 1985 Trustees' Meeting?**

78. On April 19, 1985 the Board of Trustees met in Nashville, Tennessee. At the part of the April 19, 1985 meeting devoted to the Annuity Trust Fund, a

"benefit improvement" that raised the percentage used in the benefit formula to 3½% of highest average pay was discussed and approved after an actuarial valuation. Ex. 8; Tr. (6/11/08) 125-8 to 126-12.

79.    The April 19, 1985 minutes of the Trustees' meeting state that Ms. Rachelson and Tamsin Milton, an actuary with the Wyatt Company, "discussed the impact on the Plan of the Retirement Equity Act ("REA") and the following changes that would be required." The minutes then describe four changes. With respect to the one-year-at death rule, the minutes state that "under REA the annuity must be payable to the spouse who was married to the Annuitant for the year prior to the annuity starting date" and further state that "a motion was approved amending the Plan to <u>delete</u> the current one year before death rule and to <u>replace</u> it with the REA one year before annuity commencement rule." Ex. 8 (emph. added).

80.    According to the minutes, three other changes attributable to REA were discussed, namely: (1) the addition of a new survivor's benefit for deferred vested participants who die before retiring, (2) an increase in the dollar limit on lump sum distributions from $1,750 to $3,500, and (3) a new provision about honoring Qualified Domestic Relations Orders ("QDRO"s). Amendments that might be required by new regulations on top-heavy plans and the distribution of

assets on plan termination were also discussed.  See Ex. 8.

81.    All three of the trustees who attended the April 19, 1985 Annuity Trust Fund meeting, James Souza, George Davis, and James Worsham, testified at trial or in depositions that there was no vote on an amendment to the survivor annuity rule. Ex. 48 (Davis Depo) 48-1 to 49-4; Ex. 49 (Worsham Depo) 32-2 to 34-22; Tr. (6/11/08) 127-5 to 129-15.

82.    George Davis was the Chairman of the ATF at the time.  He served as trustee from 1978 to 1986 and then as Director of Safety and Health from 1986 to 1994.  He testified at his deposition in Wilmington, Delaware that he was "in the process of divorce" at the time and there was "no way" he would have approved such a change. Ex. 48 (Davis Depo) 20-9 to 21-17 and 66-4 to 69-17. Mr. Davis testified that he did not recall any discussion during the meeting about changing the survivor annuity rule and that "it never came to a vote."  *Id.* at 48-1 to 49-4.

83.    James Worsham, who served as a trustee of the ATF from 1981 to 1994, and then as Director of Retirees from 1994 to 1998, testified at his deposition in Chicago that during his entire tenure on the Board of Trustees, "everything that had to do with the annuity trust was an improvement.  I don't recall voting or discussing anything that was not an asset to the annuitant or the survivor."  Ex. 49 (Worsham Depo) 32-2 to 34-22.

84.    Mr. Worsham testified that he never approved a "takeaway." Ex. 49 at 58-2 to 59-4. His understanding was that all amendments approved in 1985 were improvements that "were good for the participants." *Id.* at 45-14 to 47-16 and 60-15 to 61-1. He testified that during the April 1985 meeting the increase to the plan's benefit formula was approved because the plan had "sufficient money." *Id.* at 60-2 to 10.

85.    James Souza served as trustee of the ATF from 1978 until 1995. He testified at trial that the trustees did not adopt any change to the survivor's annuity rule at the April 19, 1985 meeting. Tr. (6/11/08) 122-5 to 17 and 126-13 to 127-23. Mr. Souza said that the change to the survivor annuity rule "unequivocally" was "never voted on and was never approved." *Id.* at 127-19 to 23.

86.    Mr. Souza testified that he would have contested a rule resulting in a surviving spouse of a second marriage "not receiv[ing] any monies." Tr. (6/11/08) 130-19 to 131-14. He also testified that the trustees "never approved anything to take a benefit away...[T]he motto of Mr. Sombrotto and the Union was to go forward all times and improve what we had as far as even the membership was concerned." *Id.* at 131-18 to 132-1.

87.    In January 2007, Mr. Young approached Mr. Souza during a game of golf in Florida about the letter Mr. Souza had written in support of Mr. Overby.

Mr. Young told Mr. Souza that "I want to talk to you about something so you won't get yourself in trouble." Mr. Young stated that he had Mr. Souza's signature as a trustee on a document showing that he approved the amendment to the survivor annuity rule. Tr. (6/11/08) 132-25 to 134-1.

88.     Shortly after the deposition at which Mr. Young was asked about this conversation, Mr. Young sent Mr. Souza a letter removing him from his position on the NALC Retirement Committee. Ex. 69; Tr. (6/11/08) 134-2 to 136-5. Mr. Young testified that the two events were unrelated even though there were five positions on the Committee and only Mr. Souza was removed. Tr. (6/16/08) 65-22 to 68-3. At his deposition and again at trial, Mr. Young denied that the golf game or conversation ever took place. Ex. 53 (Young Depo.) 97-14 to 98-13; Tr. (6/16/08) 64-13 to 65-21.

89.     If the minutes of the trustees' meeting are credited, the outside counsel to the ATF told the trustees that REA "required" the one-year-at-death rule to be "deleted" and "replaced" with a marriage-at-commencement rule. Ex. 8. Defendants' counsel at the time, Ms. Rachelson, now admits that the one-year-at-death rule did not need to be deleted. Tr. (6/12/08) 122-3 to 126-18.

90.     Under the Trust Agreement, the trustees had the right to rely on the advice that was provided to them by counsel. Ex. 56 at P 430.

26

91.    Defendants contend that Mr. Sombrotto testified at his deposition that the trustees "voted on" the amendments. Defs. Mot. for Sum. Judgment (dkt. #26) at 10 (citing Ex. 52 (Sombrotto Depo) at 73, 79, 99-100, 138).  But Mr. Sombrotto does not have any recollection of that meeting beyond what is stated in the minutes. Ex. 52 at 58-6 to 64-11.

92.    In fact, Mr. Sombrotto repeatedly said that the trustees made a "recommendation" to the Executive Council rather than that they "adopted" any amendment.  *Id*. at 44-18 to 45-13; 49-2 to 7; 74-10 to 15; and 80-10 to 21.  That had, in fact, been the procedure before 1981.  See Ex. 57 at P 75 ("Amendments to the Fund may be recommended to the Executive Council of the NALC by the Board of Trustees"). But this was not the procedure in 1985. The procedure in 1985 required the Board of Trustees to "adopt" amendments. Ex. 1 at P 92.

93.    At trial, Ms. Rachelson testified that there was no requirement to "subtract" the plan's existing one-year-at death rule and that the REA only required that the ATF "add" a provision for an annuity to the surviving spouse at the time of retirement. *Id*. at 122-11 to 123-11 and 125-14 to 20; see also *id*. at 107-10 to 108-4.

94.    Ms. Rachelson testified that the trustees were given an option to keep the one-year-at-death rule and simply add the marriage-at-commencement rule as

27

an additional benefit and that "they [the trustees] decided to eliminate that one benefit," namely, eligibility under the one-year-at-death rule. Tr. (6/12/08) 112-16 to 113-11. She repeated the assertion that "the trustees decided" to eliminate the existing eligibility rule in at least three other points in her testimony. *Id.* at 141-15 to 19, 142-13, and 124-22 to 25 ("They did subtract it, they eliminated one and they added a new one").

95.    The testimony that "they [the trustees] decided to eliminate that one benefit" is not credible in light of the minutes of the April 19, 1985 meeting which Ms. Rachelson prepared, other parts of Ms. Rachelson's trial testimony, her deposition testimony, the testimony of all three trustees, and the testimony of Mr. Young.

96.    To the extent any presentation related to this subject was made to the trustees on April 19, 1985, the minutes of the meeting state that Ms. Rachelson, the ATF's outside counsel, told the trustees that a change "would be required" to comply with the Retirement Equity Act and maintain the Plan's qualified status. See Exs. 7-8.

97.    Neither the minutes of the April 19th meeting nor Ms. Rachelson's handwritten notes of that meeting give any indication that the trustees were given a choice or option about eliminating eligibility under the existing one-year-at-

death rule. Ex. 8 at P 325 and Ex. 4 at NALC 634 (because of "new law" "eliminate - one yr. before death rule [and] replace it w/ one yr. before retirement"). Ms. Rachelson concedes that there is "nothing" in the minutes or handwritten notes that indicates that the trustees were given an option of preserving eligibility under the existing rule.  Tr. (6/12/08) 126-24 to 127-6 and 158-25 to 159-10.

98.    At her deposition, Ms. Rachelson testified that she does not recall "any consideration" of "preserving" the old rule and said that the trustees "might not have understood" the change and that it was "completely irrelevant" what they recall.  Ex. 50 (Rachelson Depo) 63-9 to 19; 70-8 to 17; 94-6 to 9.

99.    In other parts of her testimony, Ms. Rachelson also conceded that she has no recollection of any discussion with the trustees about "adding" the new rule and not having to "subtract" the existing rule.  Tr. (6/12/08) 112-23 to 113-3.  She does not recall "advising the trustees of that distinction" or any choice that they had.  *Id*. at 126-16 to 23 and 157-3 to 11.

100.    Then-President and Plan administrator Vincent Sombrotto testified "You don't have an option of not complying to the law."  Ex. 52 (Sombrotto Depo) 69-22 to 23. "[I]f it's required, what option do you have? ... There's no option there. That's a Hobson's choice." *Id*. at 70-18 to 71-3.

29

101.   Mr. Young testified quite clearly that Mr. Sombrotto relayed to him that Ms. Rachelson told the trustees and Mr. Sombrotto that the change was required by the law: "Q: ... did Mr. Sombrotto discuss any option of keeping the old rule and adding an additional rule? A: No, sir." Tr. (6/16/08) 41-13 to 15. "What Sombrotto told me is that Ms. Rachelson had brought to the trustees meeting this amendment and asserted that this was required by a change in the law." *Id*. at 41-18 to 20.

102.   Mr. Young made the same point about his conversation with Babette Ceccotti, the Cohen Weiss & Simon partner who now serves as the outside counsel for the ATF on ERISA matters (see Tr. (6/12/08) 99-3 to 10): "Q: Did Ms. Ceccotti mention that the trustees had had the option of keeping the old rule and adding a new rule to it? A: No. Ms. Ceccotti asserted that the change was made to conform with the rule that the government had changed about the women stealing the annuity of the spouses, spouses stealing the annuity of older participants." Tr. (6/16/08) 47-20 to 25.

103.   Defendants no longer contend that any written amendment related to the one-year-at-death rule existed at the time of the April 19, 1985 meeting on which the three trustees could have voted. After initially asserting privilege for the handwritten notes that Ms. Rachelson took, Defendants produced the notes,

30

including a handwritten draft of the amendment to the one-year-at-death rule dated May 15, 1985. Ex. 9.

104.    After reviewing those notes, Ms. Rachelson admitted that it was not possible for the three trustees to have adopted that language on April 19, 1985 because the amendment was drafted "subsequent to the meeting" and did not exist even as a handwritten draft at the time of the meeting.  Tr. (6/12/08) 112-9 to 14, 134-5 to 138-12 and 150-15 to 22.

105.    Mr. Souza also testified that the "Resolution A" attached to the meeting minutes was not prepared or presented to the trustees at the time of the meeting.  Tr. (6/11/08) 128-25 to 129-15.  He said that "we had no literature in front of us to read or to go–to understand fully what [Ms. Rachelson] was talking about, so it made it difficult to comprehend what she was talking about." Tr. (6/11/08) 127-1 to 4; see also Tr. (6/11/08) 128-19 to 24 ("again ... you're listening to someone talk about something that's really over your head and you don't have any books or pamphlets in front of you to really comprehend and understand what she is talking about").

106.    Ms. Rachelson's handwritten notes show that the trustees gave their "ok" to three changes at the April 19th meeting. The amendment to the one-year-at-death rule was <u>not</u> one of those three changes. Ex. 4.

107.    The amendment to the survivor's rule is also not discussed in two written communications from Ms. Rachelson that followed the April 19th meeting (both of which Defendants initially contended were privileged). A May 8, 1985 letter to Tamsin Milton, the Plan's actuary, identifies and attaches "three amendments adopted at the last meeting." The change to the one-year-at-death rule is <u>not</u> among the "three amendments." Ex. 5 at NALC 662-64; Tr. (6/12/08) 139-9 to 14.

108.    Ms. Rachelson testified she did not know why the amended survivor's annuity rule was not included among the changes attached to the May 8th letter except "I might have forgotten." Tr. (6/12/08) 143-4 to 14 and 145-23 to 146-2.

109.    A letter from Ms. Rachelson to President Sombrotto dated May 13, 1985 also says that she is enclosing "a set of the amendments to the Annuity Trust Fund which were adopted at the last Trustees' meeting in order to comply with the recently enacted Retirement Equity Act." Ex. 6 at NALC 678-680. Again, the set of amendments enclosed with this letter does <u>not</u> include any modification to the one-year-at-death requirement for survivor's benefits. *Id.*

110.    Ms. Rachelson agrees that the amendment to the survivor annuity rule is not included with the May 13th letter to Mr. Sombrotto. Tr. (6/12/08) 139-15 to

24; see also *id*. at 115-18 (the letter and attachment are "consistent with the [amendments], they don't include them all"). Again, she cannot explain why the amendment was not included in this set of amendments if it was "adopted" at the meeting. *Id*. at 143-4 to 14.

   C.    **Did the NALC Executive Council "Approve" an Amendment to Eligibility for the Survivor Annuity at the May 15, 1985 Meeting?**

   111.   The Executive Council of the NALC met on May 14-16 in Washington, D.C. The minutes from the May 14-16, 1985 meeting of the Executive Council state that "The Council unanimously approved a set of amendments to the NALC Annuity Trust Fund."  Ex.10.

   112.   The three trustees and four other members of the Executive Council who attended that meeting, including Plaintiff Halline Overby, testified at trial and in depositions that they do not recall any discussion of a change to the survivor annuity rule.

   113.   George Davis, the former trustee and national officer, testified at his deposition that the business accomplished at ATF meetings was not discussed at Executive Council meetings and that the Executive Council did not "vote" on changes approved by the trustees. With respect to the statement in the minutes that the Executive Council "unanimously approved" a set of amendments, Mr. Davis is

33

suspicious of how lawyers can "juggle the minutes." Ex. 48 (Davis Depo) 39-20 to

45-9, and 63-4 to 65-22.

114.    At his deposition, James Worsham who served as a trustee or national

officer from 1981 to 1998 testified that he did not recall any discussion at the

Executive Council meeting about changing the rule for surviving spouses.  Ex. 49

at 58-16 to 59-4.

115.    James Souza who served as a trustee or national officer from 1978 to

1999 testified that he did not recall anyone making a presentation about the

amendments at the Executive Council meeting. Tr. (6/11/08) 149-19 to 150-16.

He testified that if the amendment "was brought up it would have been contested

and this certainly wouldn't have passed."  *Id*. at 130-6 to14.

116.    As a member of the Executive Council from 1981 to 1990, Mr.

Overby attended the May 15, 1985 meeting.  Mr. Overby testified that he told

President Sombrotto he does not recall ever voting to amend the survivor's annuity

rule.  Tr. (6/11/08) 44-23 to 46-8. After Mr. Overby was told that the NALC's

position was that a vote had been taken at the May 15, 1985 meeting, he asked

other members of the Executive Council whether they recalled any such vote and

collected statements from them. *Id*. at 48-22 to 49-10.

117.    John Marco, a National Business Agent and member of the Executive

Council from 1977 to 1994, testified that there was "never" a discussion about "any reduction" in survivor's benefits at the May 15, 1985 Executive Council meeting and "had there been such a proposal, I would have voted against it." Tr. (6/12/08) 18-4 to 19-13. The only discussion he recalls concerned "increase[s]" in benefits. *Id*. at 18-22 to 24 and 26-18 to 21. He considered the change to the survivor's benefit rule to be a reduction in benefits. Id. at 18-12 to 19-13 and 34-19 to 24.

118.    Mr. Marco testified he would not have voted to change the survivor annuity rule because it would have "eliminated benefits" for his assistant and best friend, Leonard Driscoll, who had lost his wife to cancer in January 1985 and who was retiring in June 1985. Tr. (6/12/08) 20-19 to 21-7. Mr. Marco testified that he would never have voted to take away a survivor's benefit were Mr. Driscoll to remarry, which Mr. Driscoll in fact did 13 years later. *Id*. at 23-11 to 15. Mr. Marco testified that he "would have remembered" if a vote on taking away a survivor's benefit had taken place "because of my high interest in the matter." *Id*. at 31-16 to 32-25.

119.    James Edgemon, who served as a National Business Agent from 1974 to 1994, testified that he was in the process of his second divorce at the time of the May 1985 meeting. Tr. (6/11/08) 160-20 to 161-8. In the property settlement for

that divorce, Mr. Edgemon had preserved all of his ATF pension, including the survivor annuity. *Id*. at 160-20 to 161-6. Mr. Edgemon does not recall approving any amendments to the survivor's annuity rules at the May 15, 1985 meeting. Tr. (6/12/08) 10-11 to 11-7. Mr. Edgemon testified that he would have taken notice of any changes in the rules having to do with marriage and divorce and would have been "extremely vocal" if it had been discussed. Tr. (6/11/08) 161-11 to 162-22 and 178-20 to 179-19.

120.   President Young confirmed that Mr. Edgemon would go "on for an hour and a half until he became comfortable and understand what he was voting on." Tr. (6/16/08) 53-4 to 54-16.

121.   Letters and memos to file that Mr. Edgemon brought to trial also demonstrated that he was interested in the survivor's annuity before and after the May 15, 1985 Executive Council meeting. Ex. 67.

122.   Mr. Edgemon testified that when he first heard about a "marriage before commencement" rule in October 1997, he called the Assistant Plan administrator at the time, Meryl Solimini-Beck, immediately to learn about it.  Tr. (6/11/08) 165-10 to 166-19.   After Ms. Beck consulted with outside legal counsel, she told Mr. Edgemon that the rule "is in the statutes and has been since the inception of the Trust fund."  Ex. 67 at sixth page; Tr. (6/11/08) 166-20 to 24. Mr.

36

Edgemon testified that he "was really surprised, and frankly, angry that now we have something that's a rule that all these years I didn't know about."  Tr. (6/11/08) 166-25 to 167-3.

123.   Mr. Edgemon told Ms. Solimini-Beck in that conversation that the rule was "unfair" because an annuitant whose spouse passes away would be unable to provide the survivor's benefit to a subsequent spouse.  He was also concerned about his own circumstances because he had been married twice before and planned to marry again.  Tr. (6/11/08) 167-4 to 12.

124.   Mr. Edgemon typed up his notes of the October 1, 1997 conversation with Ms. Solimini-Beck and kept them.  Ex. 67.  Defendants objected to the introduction of this memo as an exhibit at trial but waived any objection to the document by using it affirmatively on cross-examination for another purpose.  Tr. (6/12/08) 2-17 to 4-14.

125.   Mr. Edgemon further testified that it was his practice to take "copious" notes of Executive Council meetings. Tr. (6/11/08) 184-23 to 187-16. Mr. Young confirmed that Mr. Edgemon took "extensive" notes. Tr. (6/16/08) 30-6 to 15.  After his retirement in 1999, Mr. Edgemon went through his notes and kept the ones he thought were "important."  He testified that he would have "definitely kept" any notes concerning a change to the survivor's annuity rule

37

because of his high level of interest in the subject. Tr. (6/11/08) 186-5 to 187-24.

126.   Lawrence Hutchins, who was a National Business Agent from 1979 until 1985 and then served as the NALC's Vice President from 1986 until 1994, testified that he attended the May 15, 1985 Executive Council meeting and that the Council never voted to change survivor's benefits.  Tr. (6/12/08) 43-5 to 44-19. Mr. Hutchins testified there would have been problems if the change was ever discussed because "there were some who were in the process of being divorced, some who had been divorced, they would have had a keen interest in it," and there were members of the Council such as Mr. Edgemon and Mr. Marco who "were never hesitant to voice their opinion" and "would have expressed an opinion on this particular amendment, an amendment of this nature."  Tr. (6/12/08) 44-20 to 45-4.

127.   Until he was contacted by Mr. Overby in 2004, Mr. Hutchins' understanding of the survivor annuity rule continued to be that the spouse had to be married to the annuitant for one year at death.  He believed the rule was the same as the one under CSRS.  Tr. (6/12/08) 45-14 to 46-5.

128.   Vice President Hutchins testified he recalls only two votes about the ATF by the Executive Council: The first was whether to permit Vincent Sombrotto to make a payment to the ATF to obtain credit for the years he served as President

38

of his local branch and the second was whether to allow Richard O'Connell to rejoin the ATF after he had already commenced benefits. Tr. (6/12/08) 42-14 to 43-4 and Ex. 34 at P 143. Mr. Hutchins did not recall any instance in which the Executive Council voted to reduce benefits for ATF participants. Tr. (6/12/08) 46-6 to 10.

129.    Letters from Robert Buntz, Paul C. Davis and Eugene McNulty, all of whom were members of the Executive Council, were also presented to Defendants' counsel. Exs. 65 and 34. Consistent with the trial and deposition testimony described above, those letters also indicate that the Executive Council did not approve a change to the survivor annuity rule in May 1985. Ex. 34.

130.    Defendants' summary judgment motion contended that President Sombrotto testified that the amendments were "voted on "by the Executive Council. Defs. Mot. Summ. Judgment (dkt. #26) at 10 (citing Ex. 52 (Sombrotto Depo) at 73, 79, 99-100, 138). But Mr. Sombrotto appears to have no independent recollection of the meeting outside of the minutes. He testified at his deposition that although he chaired the meeting, "counsel" would "probably" have been the one to talk about any ATF amendments. Ex. 52 (Sombrotto Depo) 61-24 to 64-11; 170-22 to 172-14.

131.    But Mr. Sombrotto testified that he would be "just guessing" as to

who made any presentation and that his recollection is "based on our practice" rather than a memory. *Id*. at 46-10 to 15 and 163-9 to 17. Instead of recalling any presentation about the change, he said "if anybody asked, they would have been told what the reason for the change was." *Id*. at 171-9 to 172-6.  Confronted with statements from members of the Executive Counsel that there was no vote on this change, he testified that "if they say otherwise, they're not telling the truth" and that if the officers were "so dense and so stupid" as not to understand "that's their business." *Id*. at 186-8 to 12; 190-13 to 17.  In response to the written statements from Mr. Worsham and Mr. Davis, who were trustees and then national officers, he called them "liars." *Id*. at 216-5 to 219-3.

132.   The only member of the Executive Council to testify to recalling a vote on the change to the survivor annuity rule has been shown to be offering demonstrably false testimony. During a videotaped deposition, Brian Farris testified <u>seven times</u> that he recalls a discussion by Mr. Sombrotto about this change because Mr. Sombrotto talked about Gus Johnson "as an example of divorcing his former wife and marrying his young girlfriend."  Ex. 54 (Farris Depo.) 16-24 to 17-17; 54-18 to 25; 55-9 to 17; 63-4 to 9; 64-7 to 12; 66-7 to 21; 92-23 to 93-7.  Mr. Farris testified about how he recalls that the "venom in [Mr. Sombrotto's] voice was "so intense." *Id*. at 16-24 to 17-17.

40

133.   Mr. Farris' repeated story is factually impossible.  The NALC's files indicate that Gustave Johnson did not divorce his former spouse or remarry until 1996. Mr. Johnson divorced his former spouse Ruth Johnson in August 1996.  Ex. 62 at NALC 1197-1201.  He then married Anita Strain, who was at that time age 57, in December 1996. Ex. 62 at 1202. Mr. Johnson's divorce and remarriage thus occurred over <u>eleven years</u> after the Executive Council meeting at which Mr. Farris recalls Vince Sombrotto using Mr. Johnson "as an example of divorcing his former wife and marrying his young girlfriend."

134.   Mr. Edgemon, Mr. Marco, and Mr. Hutchins testified that they do not recall hearing anything about "Gus Johnson" at the May 15th meeting. Tr. (6/11/08) (Edgemon) 180-17 to 181-20; Tr. (6/12/08) (Marco) 29-14 to 17; Tr. (6/12/08) (Hutchins) 45-10 to 13. Mr. Edgemon testified that he was very close to Mr. Johnson and would never have stood for disparaging remarks about him. Tr. (6/11/08) 181-6 to 20.  Moreover, consistent with President Sombrotto's testimony, both Mr. Marco and Mr. Hutchins testified that any presentations about the ATF would have been handled by Bruce Simon, rather than Mr. Sombrotto. Tr. (6/12/08) 26-12 to 17 and 40-3 to 5.

135.   In his deposition, Mr. Young testified that he had a conversation with Mr. Farris about what he knew related to this lawsuit. However, Mr. Farris did not

tell Mr. Young about anything that occurred at the Executive Council meeting. Ex. 53 (Young Depo) 89-11 to 93-5; see Tr. (6/16/08) 90-3 to 91-2 (admitting depo designation). Mr. Young also testified that he does not recall Mr. Sombrotto ever talking about an officer or former officer in "an unfavorable way" because he believed that one should "never disrespect" another union member. Tr. (6/16/08) 30-1 to 7.

136.    During his deposition, Mr. Farris testified twice that he recalls that Mr. Overby "sat across from me" at the May 15, 1985 Executive Council meeting when President Sombrotto told the story about Gus Johnson's divorce and remarriage. Ex. 54 (Farris Depo) 18-8 and 107-8 to 10. However, the seating arrangements at the Executive Council meetings made it impossible for Mr. Farris to be seated across from Mr. Overby at that time. As the Assistant Secretary-Treasurer Mr. Overby sat at the head of the table next to Mr. Sombrotto. Mr. Farris, who was a National Business Agent at that time, sat at the other end. Tr. (6/12/08) 39-5 to 20. Mr. Farris did not become a national officer until the end of 1986 when he was elected Director of City Delivery. Tr. (6/16/08) 7-4 to 6.

137.    Defendants' counsel stated at trial that they are offering Mr. Farris's deposition testimony despite the "flaw" that he is testifying under oath to "comments that Mr. Sombrotto did not say" and that "would be historically

inaccurate as of 1985." Tr. (6/16/08) 88-16 to 22.

138.   As stated above, the language of the amendment to the survivor's benefit was not in draft handwritten form until May 15, 1985. There is no evidence or testimony that the handwritten draft included as Exhibit 9 was typed and distributed to the Executive Council for approval on that day. Ms. Rachelson's May 13, 1985 letter to Mr. Sombrotto attached "a set of the amendments to the Annuity Trust Fund" which admittedly do not include any amendment to the existing survivor annuity rule. Tr. (6/12/08) 143-4 to 14 and Ex. 6. The minutes to the meeting do not say that the resolutions attached to it existed at the time of the meeting. Ex. 10 at NALC 680.

139.   The resolution that is attached to the final minutes of the meeting bears the legend "ADOPTED BY THE NALC EXECUTIVE COUNCIL, Washington, D.C., May 15, 1985." Ex. 10 at NALC 683. It is unlikely that a resolution was distributed for approval by the Executive Council which already bears the legend of its adoption.

140.   Ms. Rachelson, the outside counsel who made the presentation at the April 19, 1985 trustees' meeting, did not attend the Executive Council meeting. Tr. (6/12/08) 115-21 to 25. Ms. Rachelson testified that she has no personal knowledge of whether the resolution attached to the minutes was distributed at the

meeting. Tr. (6/12/08) 135-15 to 137-5. She also acknowledges that the typed "set of the amendments to the Annuity Trust Fund" which she sent to President Sombrotto by Express Mail on May 13, 1985 did not include the amendment in question. *Id*. at 143-4 to 14 and Ex. 6.

141.   Executive Council meetings were attended by other outside counsel from Ms. Rachelson's firm, Bruce Simon and Keith Secular.  Tr. (6/12/08) 146-23 to 147-2. Neither Mr. Simon nor Mr. Secular testified at trial or in depositions for the NALC about what occurred at the May 15, 1986 Executive Council meeting or about whether the resolution containing the amendment to the survivor annuity rule was typed and distributed by the time of the meeting.

142.   Mr. Secular  was responsible for taking notes of the meeting and preparing the minutes. Tr. (6/12/08) 38-19 to 25.  Defendants' Rule 26(a)(1) initial disclosures identified him as an individual likely to have information "regarding the preparation of the minutes of the NALC Executive Council Meeting in 1985." Two days before trial, Mr. Secular submitted a declaration stating that his notes "no longer exist" and that he "discarded them shortly after that meeting." Dkt.#30.

143.   Another piece of evidence further shows that the written amendments which appear in Article V, Section 1 of the Plan Description as of 12/31/1989 (Ex. 16) were not approved by the members of the Executive Council on May 15, 1985.

44

The 1981 Plan Description contained an exception to the one-year-at-death rule for a "parent of issue." Ex. 1 at P 87. Under this exception, even if the participant and surviving spouse are not married for one year before death, the surviving spouse will still receive the survivor's annuity if he or she is a "parent of issue." The resolution attached to the minutes of the May 15 Executive Council meeting, as well as the amendments attached to the minutes of the April 19th ATF meeting, eliminate the "parent of issue" exception along with the one-year-at-death rule. Ex. 10 at NALC 675-84 and Ex. 8 at P 328. However, the "parent of issue" exception appears in the Plan Description as of 12/31/1989 without any action by the trustees or Executive Council to re-adopt or approve it. Ex. 16 at NALC 34, see also Ex. 14 at NALC 183. Ms. Rachelson testified that she is unaware of any action by the trustees to preserve this provision. Tr. (6/12/08) 162-13 to 163-1. This indicates that if any written amendments were distributed at all at the May 15th Executive Council meeting, they were still not the final version of the amendment.

144.    The "parent of issue" exception also indicates that what former President Sombrotto initially told Mr. Overby in 2003 was true. President Sombrotto, or the outside counsel and actuaries acting under his authority as Plan administrator, decided on the final version of this change, including whether it should preserve the existing eligibility rules or any part thereof such as the "parent

of issue" exception. The first document subsequent to 1985 that relates in any way to this purported amendment is a draft of the Plan transmitted from the ATF's outside actuary to its outside counsel in which the "parent of issue" exception reappears. Ex. 14 at NALC 183. The cover letter states that the draft "reflects the changes you and I discussed in our meeting of June 23, 1989" plus "two changes we did not discuss." *Id*. at NALC 172.

## IV.    Claim 3: Ineffective Amendment Without Summary of Material Modification.

145.    Defendants stipulate that if the survivor annuity rule was amended on May 15, 1985, a Summary of Material Modification ("SMM") was required to be distributed to the Plan's participants by the end of January 1986. L.R. 16.5 Jt. Pretrial Statement (dkt.#24) at 34, ¶12.

146.    Defendants further stipulate that a Summary of Material Modification related to a change in the survivor annuity rule was not distributed to the Plan's participants by the end of January 1986. L.R. 16.5 Jt. Pretrial Statement (dkt.#24) at 34-35, ¶13.

147.    Ms. Rachelson's handwritten notes from the April 19, 1985 meeting of the Board of Trustees have a note to "Prepare notice to people." Ex. 4. Neither Ms. Rachelson nor anyone else did that. Defendants do not contend that anything

like a Summary of Material Modification of the modified survivor annuity rule was distributed until at least March or April 1990–over five years after the purported amendment. Exs. 16 and 45, Requests 21 to 25.

148.   Defendants contend that the "Annuity Trust Fund Plan Description" dated December 31, 1989 and a "Certificate of Participation" dated January 1, 1990 were distributed to participants "around April 12, 1990 and in July of 1990." Defs. Mot. Summ. Judgment (dkt.#26) at 10.

149.   Mr. Overby testified that he got his information about the ATF from talking with other officers and NALC staff. Tr. (6/11/08) 33-4 to 20. Mr. Overby testified that he did not receive the 1990 Plan Description or Certificate, or any other notice, before he retired. He testified that he did not receive a copy of the 1990 Plan booklet until he requested those documents in 2003 after Mr. Young told him that his wife would be ineligible for the survivor annuity based on this Plan description. Tr. (6/11/08) 46-17 to 47-16 and 67-7 to 23. See also Ex. 64 (October 16, 2003 letter to Mr. Overby enclosing 1989 Plan description as requested).

150.   Mrs. Overby also testified that she never saw the 1990 Plan booklet until her husband requested it in 2003.  Despite being an ATF participant herself since 1982, the only booklets she ever received were the 1999 Plan booklet and

47

Summary Plan Description, which she received in the mail in 2001. Tr. (6/11/08) 88-12 to 89-22.  In the 1980's and through the time when they were married, her only information about the pension plan was from things that Mr. Overby told her. Tr. (6/11/08) 89-23 to 90-4.

151.   Mr. Souza, Mr. Davis, Mr. Worsham, and Mr. Marco also testified that the July 1990 Annuity Trust Fund Plan Description was never distributed to them. Tr. (6/11/08) (Souza) 120-20 to 122-4; Ex. 48 (Davis Depo.) 79-17 to 83-17; Ex. 49 (Worsham Depo.) 55-19 to 56-19; Tr. (6/12/08) (Marco) 26-22 to 29-4.

152.   Mr. Souza testified that during "many years of service" from 1979 to December 1999 "I've never seen nor have I never been presented any booklet, pamphlet or any materials pertaining to the survivor benefits." Tr. (6/11/08) 120-14 to 16. He testified that the only booklets that he has, and which he keeps "in my lockbox at home," were the 1999 Plan booklet and Summary Plan Description. He said that he "never had any of the rest." *Id*. at 120-20 to 121-3.  Before receiving those booklets in the mail, his knowledge of the survivor annuity rule was that his wife would receive 60 percent of his benefit when he passed away.  He learned about that rule from a colleague, not from a booklet. Tr. (6/11/08) 138-8 to 139-13.

153.   Mr. Marco testified that the Executive Council was told many times

48

in the early 1990's by outside counsel Bruce Simon that the booklets were "delayed at the printer." Tr. (6/12/08) 26-22 to 27-12. He testified that during an Executive Council meeting in or around 1992, he asked Mr. Sombrotto what was taking so long and Mr. Sombrotto responded, "Wait a minute, John, are you getting ready to retire?" *Id*. at 26-22 to 28-2. Mr. Marco never received any Plan booklets by the time he retired in 1994. *Id*. at 28-3 to 29-4.

154.    During his deposition close to a year earlier, Mr. Davis recalled the incident in which John Marco asked President Sombrotto about receiving the booklets about the Plan and Mr. Sombrotto responded "what, are you getting ready to retire or something?" Ex. 48 (Davis Depo.) 83-8 to 85-12.

155.    Mr. Hutchins testified that was not sure if he received the 1990 Plan Description or Certificate of Participation. Tr. (6/12/08) 49-11 to 16. But the only documents he has in his possession–in a file cabinet at home–are the 1976, 1977, and 1981 Certificates of Participation. *Id*. at 46-11 to 47-12.

156.    Defendants have produced no records showing that the booklets were actually distributed.

157.    Mr. Farris, whose testimony has been offered by Defendants' counsel despite the "flaw" that it is "historically" untruthful, testified that he received the 1990 Plan booklet. Mr. Farris testified that he recalls that on the day he received

49

that booklet (although he later said "I don't even know if this is the same booklet"), he "thought to myself I better remind him [Mr. Overby] of this" and that he then went to Mr. Overby's office, "slid" the booklet across Mr. Overby's desk, and said "Chuck, if you're planning on marrying Paulette, you better pay attention to this," and then he "showed him the provision I wanted to remind him of" without saying more. Ex. 54 (Farris Depo.) 20-19 to 22-8 and 48-16 to 24. Mr. Farris testified that he did not have to tell Mr. Overby about the rule "because I already knew it. I knew about it. What I did say is, 'I think I'll go next door and remind Chuck'." *Id*. at 76-23 to 77-9. According to his testimony, Mr. Farris "already knew" about the provision because of President Sombrotto's discussion of Gus Johnson's divorce and remarriage–which Plaintiffs have shown and Defendants have agreed is "historically" impossible.

158.   Mr. Farris adds other implausible details in his story, such as recalling seeing Mr. Overby's copy of the booklet on his desk and recalling what he thought to himself before he went to see Mr. Overby and after he returned to his office. Ex. 54 (Farris Depo.) 19-1 to 22-12; 48-7 to 50-23; 76-1 to 77-1; 96-5 to 97-8.

159.   Mr. Farris told a different story to Mr. Young. According to Mr. Young's deposition, Mr. Farris told him that he told Mr. Overby "you should get married a year before you leave office." Ex. 53 (Young Depo.) 90-6 to 7. Asked

again, Mr. Young made exactly the same point: He testified that Farris told Overby "you must be married a year before you retire, according to this new change"; "Did you see it?" *Id*. at 92-15 to 19. Mr. Young was then specifically asked whether Mr. Farris had told him that they could be married for just one day before retirement. Mr. Young answered "No." *Id*. at 93-2 to 5. At his deposition, Mr. Farris testified that he does not recall directly talking to Bill Young, Ex. 54 (Farris Depo.) 43-16 to 44-12, and that he knew that they did not need to be married for one year before he retired. *Id*. at 50-3 to 51-10. If the version that Mr. Young testified to was correct, by the time Defendants contend that this booklet was distributed in April to July of 1990, it would have already been chronologically too late for Mr. Overby to marry Paulette "a year before you retire." Mr. Farris' testimony was given one month after Mr. Young's deposition.

160.   When Mr. Farris was told that there was evidence that Mr. Overby thought the one-year-at-death rule still applied (to which Defendants have now stipulated), Mr. Farris said "That's not hard and fast evidence" and said that he (Farris) has no "reason to lie." Ex. 54 (Farris Depo.) 107-19 to 108-4.

161.   Mr. Overby testified that he never had any conversation with Brian Farris about the booklet or marrying Paulette. Tr. (6/16/08) 91-22 to 92-18.

162.   Even if the Plan Description and Certificate had been distributed in

51

1990, they were not calculated to bring the change in the survivor's annuity rule to the attention of the average plan participant. Neither the Plan Description nor the Certificate contains any direction or explanation that would lead the average participant to identify and understand the change. See Exs. 15 and 16.

163.    The Plan Description and Certificate attach cover letters dated March 23, 1990 and July 2, 1990. These letters do not give any indication of a change to the survivor's rule, nor do they suggest that any side-by-side comparison with the 1981 Plan Description would be useful. See Ex. 17.

164.    The letters instead describe how benefit improvements have been to the Plan "since 1983." They mention the 3-1/2% benefit formula improvement and the change to the rule about re-employed annuitants, but do not describe any change to the survivor annuity rule.  See Ex. 17 at NALC 130 and 170.

165.    The only reference in the March and July 1990 letters that could potentially cover a negative change is a reference to "minor changes...to enable the plan to remain approved by the Internal Revenue Service."  Telling participants that "minor changes" have been made "to remain approved by the Internal Revenue Service" leads participants away from any concern that their benefits are being eliminated because the law does not ordinarily require that.

166.    The author of the July 2, 1990 cover letter, Karl Sennewald, said that

he did not know what the reference to "minor changes" meant and that the letter was, in fact, entirely written by the NALC's outside counsel. Ex. 47 (Sennewald Depo.) 72-10 to 73-21.

167.  The Plan Description and Certificate of Participation do not contain any understandable description of the change in the eligibility rules. At trial, Mr. LaFollette admitted that the Certificate of Participation does not even contain a complete description of the "marriage before commencement" rule. The description does not include any of the language about how the participant and spouse need only be married for at least one day prior to retirement.  Ex. 15; Tr. (6/12/08) 83-5 to 84-6. Mr. LaFollette admitted that by "referring to this" a participant "wouldn't know" about that rule. *Id*. at 84-4 to 6.

168.  Mr. Young testified at trial, but not at his deposition, that he recalls a "white piece of paper" accompanying the 1990 booklet which "explained the change in the survivor annuity rule." Tr. (6/16/08) 42-4 to 43-17.  He testified that he thinks this piece of paper may be "up in the attic" at his home.  Tr. (6/16/08) 45-9 to 21. Defendants never produced any such piece of paper and no one else has testified that they received it.

**V.    Claim 4: The Untimely and Misleading Summary Plan Description.**

169.  The only Summary Plan Description ("SPD") about the ATF that

Defendants have distributed since this change was purportedly adopted in 1985 is an SPD dated December 31, 1999.  Ex. 26.

170.   The SPD was not actually distributed to participants until March or April 2001–nearly 16 years after the change in the survivor annuity rule. Ex. 26 (SPD) and Ex. 28 (March 1, 2001 cover letter); Tr. (6/11/08) 37-12 to 38-23. As described above, the Plaintiffs and other witnesses all received the SPD.

171.   Defendants stipulated that a Summary Plan Description was not distributed until 2001, L.R. 16.5 Jt. Pretrial Statement (dkt. #24) at 35, ¶14, but Defendants' counsel withdrew that stipulation at the May 19, 2008 Pre-Trial Conference.  Tr. (5/19/08) 12-8 to 13.  Defendants, however, never offered any evidence of an earlier distribution.

172.   The Summary Plan Description dated December 31, 1999 is the applicable SPD in effect for any application for a survivor's annuity today. Tr. (6/12/08) 84-16 to 85-3.

173.   The SPD states that "In the event of your death, your spouse is eligible to receive a monthly benefit from the Plan if you have completed five years of Creditable Service, have reached age 67, or are currently receiving an Annuity."  Ex. 26 at P 122.  A footnote states that if an annuitant was married less than a year before the annuity commenced, the spouse "must be married to you for

at least a year prior to the date your Annuity commenced (or, if less than a year before the Annuity commenced, at least a year as of the date of death)." *Id.*

174.    Under this description, Mrs. Overby is eligible for a survivor annuity benefit because Mr. Overby has completed over five years of Creditable Service, he is well over age 67, he is currently receiving an annuity, and they will have been married for at least a year as of the date of any death (indeed, they have been married for more than 17 years).

175.    Mrs. Overby testified that based on her understanding of the survivor's benefit language in the SPD, she would be eligible and that she drafted the March 29, 2003 letter to Mr. Young describing that position even before the Overbys had legal counsel.  Tr. (6/11/08) 96-3 to 97-11.

176.    The SPD is not reasonably calculated to be understood by the average plan participant to require that the spouse must have been married to the participant before the Annuity commenced even if they were married for "at least a year as of the date of death."

177.    The Assistant Plan Administrator, Rick LaFollette, agrees that Mrs. Overby is qualified for the survivor's annuity by applying the three criteria described in the first sentence of the SPD under the "Benefit to Spouse." Tr. (6/12/08) 86-1 to 13. But Mr. LaFollette thinks that the asterisked note which

appears on the same page that the spouse must be married "at least a year as of the date of death" if the marriage was "less than a year before the Annuity commenced" discloses that a surviving spouse like Mrs. Overby is ineligible. At the same time, Mr. LaFollette agrees with the hypothetical that if a condition for using your credit card is having "less than $10" in your pocket, having "no money" in your pocket "means you have to use your credit card." Tr. (6/12/08) 88-16 to 90-2.

178.    Mr. Young testified that although the Overbys brought the language in the SPD to his attention, he and the trustees did not consider it: "I don't believe we did look at Exhibit 26 ... we grabbed the plan[] description booklet [Ex. 27] and...said well, he must just be leaving out that first part of the sentence that said if you are married before your annuity starts." Tr. (6/16/08) 49-10 to 50-5.

**VI.   Claim 5: No Disclosure of Ways to Protect the Survivor's Benefit as Required by *Eddy*.**

179.    Neither the Plan Administrator nor the Assistant Administrator provided any notice of the change in the survivor's rules to Mr. or Mrs. Overby before he decided to commence his retirement benefits on February 1, 1991.

180.    The ATF Plan Description provides that a participant or surviving spouse "must apply" using an Application approved by the Board of Trustees. Ex.

1 at P 88 and Ex. 16 at NALC 37. Since at least 1982, the ATF has used an

"Application for Retirement or Survivor Annuity." The Application is marked at

the bottom as Form ATF 13 4/82, and is provided to each retiree and surviving

spouse. Exs. 19 and 37.

181.    Defendants have stipulated that from 1985 until mid-2007, this

Application was never changed or amended.  L.R. 16.5 Jt. Pretrial Statement

(dkt.#24) at 35 ¶15.

182.    The Application contained an instruction that the surviving spouse is

eligible if he or she was "married to annuitant for at least one year immediately

preceding annuitant's death."  The instructions do not mention any modification to

the survivor annuity rule under which the marriage must have occurred before the

participant commenced his or her retirement benefits. Exs. 19 and 37.

183.    The current Assistant Plan Administrator, Rick LaFollette, admitted

that the Application's instructions on eligibility for the survivor annuity were

"misleading."  Tr. (6/12/08) 73-3 to 12 and 75-1 to 9.  He testified that in the

summer of 2007, after this instruction was discussed at a deposition in this

litigation, one of Defendants' outside counsel instructed him to redact the

instruction from the Application, which he did.  *Id*. at 73-13 to 74-12.

184.    Consistent with the Application and its instruction, Karl Sennewald,

the Assistant Administrator for the ATF from sometime before 1985 through 1996, testified at his deposition that he was unaware that there had been any change to the rule. Ex. 47 (Sennewald Depo.) 65-4 to 67-6.  Mr. Sennewald, who attended the April 19, 1985 trustees' meeting, testified that he does not recall a single application for a survivor's annuity being denied during his tenure. *Id*. at 58-4 to 59-12.

185.   Defendants have not identified a single participant in the ATF who was told that the survivor annuity rule had been modified before Mr. and Mrs. Overby were told in February 2003. Ex. 43 (Request Nos. 6 and 7) and 45 (Request Nos. 6, 31, and 34-35).

186.   Between May 15, 1985 and the date of the trial, no spouse of a deceased annuitant has been denied payment of survivor annuity benefits based on the modified survivor annuity rule. Of 76 applications for the survivor annuity since 1985, only one instance was unearthed in discovery where a survivor annuity was initially denied.

187.   In October 2001, the second wife of Gustave Johnson was initially denied a survivor's benefit based on the "marriage-before-commencement" rule. NALC files indicate Mr. Johnson retired in February 1981.  Ex. 62 (NALC 1205). In August 1996 he divorced his wife Ruth Johnson and in December 1996 he

58

married the former Anita Strain. Ex. 62 (NALC 1197-1202). The basis for reversing the initial denial of benefits to Anita Johnson is in a memorandum which Defendants assert is privileged. Ex. 42. Mr. LaFollette testified at trial that the initial denial was reversed because Mr. Johnson retired in 1981 and James Rademacher, the NALC President who preceded Mr. Sombrotto, told him to apply the old rule to Mr. Johnson's surviving spouse. Tr. (6/12/08) 63-13 to 65-15.

188.    Since Mr. Overby was told in 2003 that his wife would be ineligible, Defendants have told only two other participants, George Davis (the former Chair of the ATF Board of Trustees) and Leonard Driscoll, that their spouses will not be eligible for a survivor's benefit because of the amended survivor annuity rule.  Mr. Davis and Mr. Driscoll were told this by letter on October 19, 2004 and December 20, 2004, respectively. Exs. 35 and 36.

189.    When Mr. Overby retired, a survivor's annuity of $1,762 per month was computed for him by the Assistant Plan Administrator, Karl Sennewald. The form on which the benefit is computed states that this amount will go to the "surviving spouse, if any."  Ex. 20.

190.    The parties stipulate that Mr. Overby's understanding at the time of his property settlement in 1991 was that the survivor annuity under the ATF went to the spouse at the time of the annuitant's death. Tr. (6/11/08) 30-9 to 32-11.

191.    When he filed his Application for Retirement in October 1990, there was no space on the Application for him to name his surviving spouse, if any. Ex. 19. But in June 1999, Mr. Overby received a beneficiary update form from the ATF. He completed and returned that form listing Paulette Overby as his beneficiary. Ex. 24; PFF. ¶32.

192.    Mrs. Overby testified that the beneficiary update form confirmed her understanding that she would receive the survivor's benefit.  Tr. (6/11/08) 88-4 to 11.  The ATF accepted that designation and never told Mr. Overby that there was any issue. Tr. (6/11/08) 34-17 to 35-8.

193.    As Mr. Overby indicated in his March 2003 letter to the Plan administrator, his understanding was that a participant and spouse must be married for at least one year before his death, parallel to the rules under the Civil Service Retirement System. Ex. 31 at P 4-5.

194.    The SPD distributed in March or April 2001 also suggested that the previous rule continued to apply by stating that the surviving spouse could be eligible in three ways: (1) by being married "for at least a year prior to the date your Annuity commenced," (2) "or, if less than a year before the Annuity commenced, at least a year as of the date of death," or (3) by being "the parent of a child or children from that marriage." Ex. 26 at P 122.

60

195.   The Overbys testified they had no idea that Mrs. Overby would not be eligible for the survivor annuity until the conversation with Ms. Weir and the February 7, 2003 letter from Mr. Young. Tr. (6/11/08) 56-18 to 23, 90-5 to 94-8.

196.   If Mr. Overby had been notified of the change in the rules before he retired, he could have married Paulette Motayne before his annuity commencement date. Tr. (6/11/08) 26-23 to 27-7; 98-23 to 99-6.  The Overbys testified that once Mr. Overby obtained his divorce there was no particular or overriding reason for choosing their May 30, 1991 marriage date and that they could have married sooner. Tr. (6/11/08) 26-23 to 27-7; 85-17 to 86-5.

197.   Defendants admit that if Mr. Overby had known about the modified rule, he "easily could have" married Mrs. Overby "before he retired". Defs. Mot. Summ. Judgment (dkt. #26) at 7.

Dated:  July 23, 2008

Respectfully submitted,

  s/ Stephen R. Bruce
Stephen R. Bruce (DC Bar No. 289066)
Allison C. Pienta (DC Bar. No.494372)
805 15th St., NW, Suite 210
Washington, DC 20005
Telephone: (202) 371-8013
Facsimile: (202) 371-0121

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this 23rd day of July, 2008, a true and correct copy of (1) Plaintiffs' Proposed Findings of Fact, (2) Plaintiffs' Proposed Conclusions of Law, and (3) this Certificate of Service was sent via CM/ECF electronic filing, addressed to the following parties:

John C. Hayes
Emily K. Hargrove
NIXON PEABODY LLP
401 Ninth Street, N.W.
Suite 900
Washington, D.C. 20024-2128

Attorneys for Defendants


/s/ Stephen R. Bruce