UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HALLINE OVERBY, *et al.* | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 06-1356 (RMC) |
| NATIONAL ASSOCIATION OF LETTER CARRIERS, *et al.* | ) ) ) ) | |
| Defendants. | ) ) ) | |

MEMORANDUM OPINION

      This is an action arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Halline Overby was a letter carrier with the United States Postal Service and then an officer of the National Association of Letter Carriers ("NALC") until his retirement in February 1991. He and his wife Pauline sue NALC, the NALC Annuity Trust Fund ("ATF" or "Fund"), and the Fund's trustees because the Fund has denied that Mrs. Overby is eligible for a survivor's benefit upon Mr. Overby's death. The Overbys married four months after Mr. Overby retired and have now been married for over 17 years. The Fund insists, however, that the rule for eligibility – which used to be that a spouse had to be married to an annuitant for at least one year before the annuitant's death – was changed in 1985 to require that a spouse be married to an annuitant before retirement to be eligible for a survivor's benefit. The Court finds that the Fund's trustees never properly amended the ATF to drop a survivor's benefit for a spouse married to an annuitant for at least one year at the time of the annuitant's death, that such a benefit accrued to the Overbys, and that Mrs. Overby is entitled to a survivor benefit upon Mr. Overby's death.

## I. FINDINGS OF FACT

The Court held a three-day bench trial in this case on June 11, 12, and 16, 2008.[1] From the entirety of the record, including the demeanor and credibility of the live witnesses and the credibility of witnesses otherwise presented, the Court makes the following findings of fact.

1. NALC is a national labor union which represents city delivery carriers employed by the United States Postal Service. NALC sponsors a retirement plan called the ATF. The ATF covers NALC's national officers, national business agents, certain branch officers, headquarters employees, and employees of NALC's Health Plan, but not postal carriers. Pls.' Ex. 27 at P 130. At the end of 2004, the Fund had approximately 581 active participants and 376 annuitants. Joint Pretrial Statement [Dkt. # 24] at 1-2.

2. The President of NALC serves as Plan Administrator for the ATF. Pls.' Ex. 56 at P 424; Pls.' Ex. 57 at P 74. The Board of Trustees of NALC has oversight responsibilities for the union, the ATF, the NALC Health Benefit Program, and the NALC Life Insurance Program. Pls.' Ex. 55 at 41. There are three trustees on the Board of Trustees, who are elected by union members. The union also is governed by a 28-member Executive Council, consisting of the three trustees, national officers and national business agents. Pls.' Ex. 55 at 42.

3. It is undisputed that the plan document which governs the ATF allows the Board of Trustees to adopt amendments to the plan but any proposed amendment must first be evaluated by the ATF's actuaries and, after adoption by the Board of Trustees, must then be approved by the NALC Executive Council. Pls.' Ex. 1 at P 92.

---

[1] Citations to testimony at the evidentiary hearing are to the transcript of June 11, 12, and 16, 2008, and are cited as "Tr. I," "Tr. II," or "Tr. III" respectively, followed by a page number.

**A. The Survivor Annuity Provided by the ATF**

1. One of the benefits offered by the ATF is a benefit to a surviving spouse equal to 60% of the participant's accrued benefit. Pls.' Ex. 1 at P 87.

2. The parties agree that under the ATF in effect at least until May 15, 1985, the surviving spouse was the "one to whom the Annuitant was married for at least one year immediately preceding the Annuitant's death, or is the parent of issue by such marriage." Pls.' Ex. 1 at P 87. This is termed the "one-year-at-death" rule.

3. Although they dispute the legality of the change, the parties do not dispute that at some time between 1985 and 1989, the ATF was changed to provide for different eligibility requirements. Article V, Section 1(b) of the Fund now states:

> Upon death of an Annuitant, the surviving spouse (if any) is eligible for an Annuity of 60% of the Annuity being paid to the Annuitant at the time of death, provided that the spouse is one to whom the Annuitant was married for at least the year immediately preceding and ending on the Annuitant's annuity commencement date, or is the parent of issue by such marriage. Notwithstanding the foregoing, if the Annuitant and the spouse were married within the year before the annuity commencement date and were married for at least one year ending on or before the Annuitant's death, that spouse shall be paid the Survivor Annuity as if the spouse and the Annuitant had been married for the year ending on the annuity commencement date.

Pls.' Ex. 16 at NALC 34. This provision is termed the "marriage-at-commencement" rule.

4. Since the Overbys married four months after Mr. Overby commenced receiving an ATF annuity, Mrs. Overby would be eligible for a survivor's benefit only under the "one-year-at-death" rule, which the Defendants insist has not been in effect since 1985.

**B. The Overbys and the Denial of Survivor Benefits to Mrs. Overby**

1. Halline Overby was born in 1920 and became a letter carrier in 1960. Tr. I, 14-15. He was elected president of his local union in 1969 and was elected to NALC's Board of Trustees in 1978. Tr. I, 16-17. Mr. Overby served as a trustee until 1981 and was Chairman of the Board of Trustees in his final year. Joint Pretrial Statement at 33 (Stipulations), ¶ 1.

2. In April 1981, Mr. Overby was appointed Assistant Secretary-Treasurer of NALC, was elected to that office in 1982, and continued in that capacity until 1990. Tr. I, 19-20. As a national officer, Mr. Overby worked at NALC headquarters in Washington, D.C., from 1982 until 1990. Tr. I, 20. First as a trustee and then as a national officer, Mr. Overby served on the NALC Executive Council from 1978 to 1990. Tr. I, 48. First as a trustee and then as a national officer, Mr. Overby was a participant in the ATF from 1978 until his retirement. Tr. I, 18-19.

3. The Overbys met in 1980 and began to live together in 1982. Tr. I, 84-85. Mrs. Overby began working for the NALC Health Plan in October 1982 and remains in that position to this day; as such, she is a participant in the ATF. Tr. I, 84. The Overbys were married on May 30, 1991, almost four months after Mr. Overby's retirement. Tr. I, 85-86.

4. On May 1,1986, Mr. Overby suffered a stroke. Tr. I, 85. Although he achieved a substantial recovery through therapy, he continued to have problems with speech and mobility. Tr. I, 22-23. As a result, Mr. Overby did not seek re-election to his position as Assistant Secretary Treasurer in 1990 and his term of office ended in December of that year. Tr. I, 23, 86.

5. As an ATF annuitant, Mr. Overby receives a monthly benefit of $2,936. Pls.' Ex. 20. Payment of this benefit commenced on February 1, 1991, when he was age 70 1/2. Pls.' Ex.

20. As of December 1980, when the annuity for his surviving spouse was calculated, it would be $1,762 per month. Pls.' Ex. 20 at P 26.

6. Before he left Los Angeles in 1981, Mr. Overby had separated from his first wife, Lucille Overby. Tr. I, 20-21. Both parties to that first marriage initiated divorce proceedings in 1990, Mr. Overby in Virginia and Lucille Overby in California. Defs.' Exs. 105a & 107. The Virginia divorce became final in August 1990. Defs.' Ex. 105e. Under a property settlement signed on January 6, 1992, each party to the first marriage retained all employee benefits, including retention by Mr. Overby of his ATF annuity benefits, although Lucille Overby received a portion of Mr. Overby's retirement and survivor benefits from the Postal Service/Civil Service Retirement System. Ex. 107b; Tr. I, 27-29. The parties have stipulated that when Mr. Overby was working out his property settlement with Lucille Overby in 1991, his understanding of the survivor annuity rule under the ATF was that the "one-year-at-death" rule was still in effect. Tr. I, 30-32; Tr. II, 120-121.

7. Mr. Overby became ill again in the late 1990s and Mrs. Overby became concerned for her own financial stability. Tr. I, 90-91. She spoke to NALC President Bill Young in both 1998 and 2002 about checking the documents to ensure that the change in beneficiaries from Lucille Overby to her had been recorded. Tr. I, 90-91.

8. In February 2003, Mrs. Overby inquired about the life insurance beneficiary designation again while at the NALC accounting office. Misunderstanding the question, a senior accountant responded that Mrs. Overby was not eligible to receive an ATF survivor's benefit. Tr. I, 91. This advice was confirmed by telephone the next day and was based on the fact that the Overbys were not married when Mr. Overby began receiving his annuity payments.

       Tr. I, 91-92.

9. When Mrs. Overby called the office of union president Bill Young, she was assured by his assistant that Mrs. Overby was eligible for the survivor annuity. Tr. I, 92. However, by letter dated February 7, 2003, to Mr. Overby, Mr. Young stated that Mrs. Overby is not eligible for the survivor annuity benefit because their marriage "occurred after you commenced your retirement." Pls.' Ex. 30 at NALC 111. The letter included a memorandum from Richard LaFollette, assistant administrator of the ATF, citing the "marriage-at-commencement" rule and advising that "[t]he most important aspect of this rule is that the annuitant must be married on the day the annuity commences," and that Mrs. Overby was ineligible under the rule because she married Mr. Overby "at least three months after his commencement date." Pls.' Ex. 30 at NALC 112. Mr. Young further advised that he would check with legal counsel "to determine if there is any flexibility in this regulation" and would call "once [he] receive[d] that legal advice." Pls.' Ex. 30 at NALC 111.

10. Mr. Young then met with the Overbys and said that he had not even known that the "marriage-at-commencement" rule existed until the Overbys called him. Tr. I, 44, 94.

11. Mr. Young had replaced Vincent Sombrotto as NALC's president and ATF plan administrator in December 2002. Tr. III, 7-8. Mr. Overby next contacted Mr. Sombrotto to inquire about the change in rules. Tr. I, 44-45. Mr. Overby reports that Mr. Sombrotto said that he had adopted the amendment in his capacity as plan administrator. Tr. I, 44-46. At his deposition, Mr. Sombrotto denied the statement and stated that "the executive council decided" to make the change. Pls.' Ex. 52 (Sombrotto Dep.) at 44-45.

12. By letter dated March 29, 2003, Mr. Overby requested a review of the denial of survivor's

benefits to Mrs. Overby. Pls.' Ex. 31.

13. The Board of Trustees denied Mr. Overby's appeal at a meeting on April 23, 2003. Pls.' Ex. 32. As Mr. Young advised Mr. Overby by letter dated May 7, 2003, "[b]ecause you were married to your current spouse after your annuity commencement date, your current spouse is not entitled to survivor benefits under the Plan." Pls.' Ex. 33 at P 6.

14. Thereafter, Mr. Overby contacted former trustees from the relevant time, *i.e.*, George Davis, James Souza, and James Worsham, and five former members of the Executive Council, *i.e.*, John Marco, Lawrence Hutchins, Robert Buntz, Paul C. Davis, and Eugene McNulty. Pls.' Ex. 34. Each of them subsequently wrote to Mr. Overby affirming that they had no recollection of an amendment to the surviving spouse rule presented to the trustees at an ATF meeting on April 19, 1985, as asserted by the Fund, or a vote by the Executive Council on any such amendment on May 15-16, 1985. Pls.' Ex. 34.

15. Through counsel, on February 8, 2006, Mr. Overby requested reconsideration of the denial of benefits to Mrs. Overby, based on these letters. Pls.' Ex. 65. The record is barren of evidence that the plan administrator or current trustees ever investigated further. President Young testified that he never saw the letters until after depositions in this case in May and June of 2007. Tr. III, 50-51, 70-71.

16. This lawsuit was filed in August 2006.

**C. The Adoption of a Changed ATF Survivor Benefit**

1. Article IX, Section 1 of the ATF – entitled "Authority to Amend" – provides:

> The provisions of the Plan may be amended at any time by the Board of Trustees provided that the Trustees shall submit such proposed amendments to the Fund's Actuary for an evaluation and estimate of

>   its cost, and adoption of amendments by the Trustees shall be subject
>   to the approval of the Executive Council of the NALC.

Pls.' Ex. 1 at P 92.

2.  Article IX, Section 2 of the ATF – entitled "Prohibited Amendments" – provides:

    >   No amendment shall be adopted that operates to reduce the vested
    >   rights of any Participant, former Participant, or Annuitant.

    Pls.' Ex. 1 at P 92.

3.  Defendants assert that the Board of Trustees "adopted" a change to the ATF survivor benefit at their meeting on April 19, 1985. The minutes of that meeting indicate that the trustees were advised that a change was "required" by the Retirement Equity Act ("REA") to maintain the plan's qualified status. Pls.' Ex. 8 at P 325.

4.  Ms. Jani Rachelson served as outside counsel to the ATF in 1985. Tr. II, 96-97. As counsel, she attended the April 19, 1985 trustees' meeting and took notes. Tr. II, 102-03. Ms. Rachelson testified that the REA only required the addition of a survivor's annuity for a spouse married at the time of retirement and did not require a plan to subtract eligibility based on the one-year-at-death rule. Tr. II, 122-25. Ms. Rachelson further testified that she did not recall any consideration of whether elimination of the one-year-at-death rule would violate the protection of accrued benefits afforded by ERISA. Tr. II, 154-155, 157. Nor could she recall any consideration of the ATF's provision prohibiting amendments "that operate[] to reduce the vested rights of any Participant, former Participant, or Annuitant." Tr. II, 154; Pls.' Ex. 1 at P 92.

5.  Ms. Rachelson testified that she could not recall whether an actuarial evaluation of the proposed amendment to the survivor annuity rule occurred before the April 19, 1985 trustees'

meeting. Tr. II, 153. She further testified that she did not talk to any actuary about the proposed amendment. Tr. II, 130.

6. Ms. Rachelson testified that the proposed amendment to the survivor annuity rule was not drafted until after the April 19, 1985 trustees' meeting and that a draft of the proposed amendment was not distributed to the trustees at that meeting. Tr. II, 112, 150.

7. James Souza, a trustee who attended the April 19, 1985 trustees' meeting, testified that the proposed amendment to the survivor annuity rule "unequivocally" was "never voted on and was never approved." Tr. I, 127.

8. The amendment to the survivor annuity rule was not mentioned in two letters from Ms. Rachelson drafted shortly after the April 19, 1985 trustees' meeting advising ATF's actuaries and the union's president, respectively, of the amendments adopted at that meeting. Pls.' Ex. 5 (May 8, 1985 letter to the Wyatt Company) ("enclosing a draft of the three amendments adopted at the [April 19, 1985 trustees'] meeting . . ."); Pls.' Ex. 6 (May 13, 1985 letter to NALC President Sombrotto) ("enclosing a set of the amendments to the Annuity Trust Fund which were adopted at the [April 19, 1985] Trustees' meeting . . ."). Ms. Rachelson could not explain why the amendment to the survivor annuity rule was not included in those letters. Tr. II, 143, 145-46.

9. The NALC Executive Council met on May 14-16, 1985 in Washington, D.C. Pls.' Ex. 10. The minutes of that meeting provide that "[t]he Council unanimously approved a set of amendments to the NALC Annuity Trust Fund." Pls.' Ex. 10 at NALC 680. Defendants assert that the Executive Council "approved" the proposed amendment to the survivor annuity rule at that meeting.

10. John Marco, a member of the Executive Council in 1985, testified that there was "never" a discussion about "any reduction" in survivor's benefits at that Executive Council meeting and "had there been such a proposal, I would have voted against it." Tr. II, 18-19.

11. James Edgemon, a member of the Executive Council in 1985, testified that the Executive Council "[a]bsolutely [did] not" review the proposed amendment to the survivor annuity rule at the May 14-16, 1985 meeting. Tr. I, 162.

12. Lawrence Hutchins, also a member of the Executive Council in 1985, testified that he did not recall voting to amend the survivor annuity rule at that Executive Council meeting and that "any resolution of this magnitude that would [a]ffect some of the individuals there, there were some who were in the process of being divorced, some who had been divorced, they would have had a keen interest in it." Tr. II, 44.

13. Vincent Sombrotto, then-NALC President and Chairman of the Executive Council, testified at a deposition that the proposed amendment was approved by the Executive Council. Pls.' Ex. 52 at 73.

## II. LEGAL STANDARDS

"An individual who is a potential beneficiary, regardless of whether he or she becomes an actual beneficiary, has standing to bring an ERISA suit." *Muller v. First Unum Life Ins. Co.*, 23 F. Supp. 2d 231, 234 (N.D.N.Y. 1998). Thus, Plaintiffs have standing despite the fact that Mr. Overby, the Annuitant, is not deceased.

The parties disagree as to which of two standards of review under ERISA should be applied by the Court. Plaintiffs argue that the standard of review should be *de novo*. Defendants argue that the standard of review should be abuse of discretion. The Court finds that the precise

standard of review need not be determined because the trustees' failure to comply with the Fund's formal amendment procedure is unlawful under either standard of review. *See Wagener v. SBC Pension Benefit Plan-Non Bargained Program*, 407 F.3d 395, 403 (D.C. Cir. 2005) (declining to decide which standard of review to apply to a committee's employee benefit plan interpretation that "fails whether we apply *de novo* review or a deferential standard of review"). "[E]ven under a deferential standard of review, Plan fiduciaries cannot claim deference for an interpretation of the Plan . . . that contradicts the Plan's plain language." *Id.* at 405.

### III.  ANALYSIS

ERISA Section 402(b)(3) requires that every employee benefit plan "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan." 29 U.S.C. § 1102(b)(3). "[T]he literal terms of § 402(b)(3) are ultimately indifferent to the level of detail in an amendment procedure, or in an identification procedure for that matter." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 80 (1995). "The provision requires only that there *be* an amendment procedure, which here there is." *Id.* (emphasis in original). "A 'procedure,' as that term is commonly understood, is a 'particular way' of doing something, or a 'manner of proceeding.'" *Id.* (citations omitted). "Requiring every plan to have a coherent amendment procedure serves several laudable goals[,]" including "increas[ing] the likelihood that proposed plan amendments, which are fairly serious events, are recognized as such and given the special consideration they deserve." *Id.* at 82.

ERISA "follows standard trust law principles in dictating only that whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level." *Id.* at 85. "An employer may, of course, retain the unfettered right to alter its promises,

but to do so it must follow the formal procedures set forth in the plan." *Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.*, 520 U.S. 510, 515-16 (1997). Accordingly, a proposed amendment not done in accordance with a plan's amendment procedure is ineffective and does not amend a plan. *See id.* at 516 ("the 'cognizable claim [under ERISA] is that the company did not [amend its welfare benefit plan] in a permissible manner'") (quoting *Curtiss-Wright Corp.*, 514 U.S. at 78) (alterations in original); *see also Depenbrock v. Cigna Corp.*, 389 F.3d 78, 82 (3d Cir. 2004) ("an amendment is ineffective if it is inconsistent with the governing instruments"); *Shaw v. Conn. Gen. Life Ins. Co.*, 353 F.3d 1276, 1283 (11th Cir. 2003) ("Having created a particular procedure, it seems evident to us that the parties . . . must follow that procedure in order to create enforceable amendments"); *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 58-59 (4th Cir. 1992) ("any modification to a plan must be implemented in conformity with the formal amendment procedures[;] informal written modifications to a plan . . . are of no effect"); *Miller v. Coastal Corp.*, 978 F.2d 622, 624 (10th Cir. 1992) ("An employee benefit plan cannot be modified . . . by informal communications, regardless of whether those communications are oral or written, [because] ERISA requires all modifications to an employee benefit plan to . . . conform to the formal amendment procedures") (citations omitted).

The ATF's formal amendment procedure provides for three conjunctive conditions precedent to a valid amendment:

(1) The trustees must first submit the proposed amendment to the Fund's actuaries "for an evaluation and estimate of its cost;"

(2) The trustees must then "adopt" the proposed amendment; and

(3) NALC's Executive Council must then "approve" the proposed amendment.

Pls.' Ex. 1 at P 92. The proposed amendment was to substitute the "marriage-at-commencement" rule required by the REA for the "one-year-at-death" rule, so that the former rule would replace and supersede the latter rule. Thus, in order to have legal effect, the proposed substitution of rules must have been (1) submitted to the Fund's actuaries "for an evaluation and estimate of its cost," (2) "adopted" by the trustees, and (3) "approved" by the Executive Council.

There is no evidence in the record that the trustees ever submitted the proposed substitution of rules to the Fund's actuaries before they assertedly "adopted" it, as the first step of the ATF's amendment procedure requires. The entirety of the relevant portion of the minutes of the April 19, 1985 trustees' meeting, at which Defendants assert the proposed amendment was "adopted," state as follows:

> It was noted that Article V, Section 1(b) of the Plan currently provides that the spouse's survivor annuity is payable upon the Annuitant's death to the spouse at the time of death, while under REA the annuity must be payable to the spouse who was married to the Annuitant for the year prior to the annuity starting date. If the marriage took place within the year before the annuity starting date, however, REA provides for payment to that spouse, provided the spouse and the Annuitant were married at least one year before the Annuitant's death. Accordingly, a motion was approved amending the Plan to delete the current one year before death rule and to replace it with the REA one year before annuity commencement rule, subject to the exception noted above for marriages within that year.

Pls.' Ex. 8 at P 325, ¶ 7.a. The minutes make no reference to an actuarial evaluation or estimation occurring at that meeting with respect to the proposed substitution of rules. The omission of such an actuarial evaluation and estimation is telling when juxtaposed against the next subparagraph of those same minutes, in which it is recorded that before the trustees adopted a survivor's benefit for spouses of terminated vested employees, as the REA also purportedly required, "[t]he Actuaries

-13-

advised that the cost of providing the maximum survivor benefit to the terminated vested Employee, i.e. 60% commencing immediately, is estimated at .1% of payroll." *Id.* at P 326, ¶ 7.b. It also is telling that the minutes of the December 5, 1985 trustees' meeting specifically mention that the Fund's actuaries undertook an actuarial evaluation at that meeting, though not of the "marriage-at-commencement" rule. *See* Pls.' Ex. 12 at NALC 701, ¶ 6. Given that when these actuarial evaluations occurred at trustees' meetings they were reflected in the minutes, the omission of any reference in the minutes to an actuarial evaluation with respect to the "marriage-at-commencement" rule is strong evidence that one never occurred. This is especially so considering that Defendants rely on those same minutes as evidence that the trustees "adopted" the proposed amendment. *See* Defs.' Proposed Findings of Fact ¶ 17.

That no actuarial evaluation or estimation ever occurred with respect to the "marriage-at-commencement" rule prior to its asserted "adoption" is further established by the testimony adduced at trial. Ms. Rachelson, outside counsel to the Fund at the time and the person who prepared the minutes of the April 19, 1985 trustees' meeting, testified that "[t]he minutes accurately reflect what happened" and that she did not "know how we would determine what happened any other way." Tr. II, 162. She further testified that the actuaries were "absolutely" present at the April 19, 1985 trustees' meeting and that they "absolutely" participated in that meeting. Tr. II, 164. However, when asked about whether the actuaries had been consulted about the proposed addition of the "marriage-at-commencement" rule, she testified that she had not "talked to any actuary about this subject" (Tr. II, 130) and that she had "no current recollection" about whether the proposed amendment was submitted to the Fund's actuaries. Tr. II,153. Her notes of the April 19, 1985 trustees' meeting, like the minutes of that meeting, reflect that the "marriage-at-

commencement rule" was discussed but omit any reference to an actuarial evaluation or estimation having occurred with respect to that rule. *See* Pls.' Ex. 4 at NALC 634.

Defendants have not pointed to, and the Court cannot find, any evidence in the record showing that the proposed amendment was submitted to the Fund's actuaries for an evaluation and estimation prior to its purported "adoption" by the trustees. Instead, Defendants argue that (1) the trustees cured any procedural deficiencies by subsequently ratifying the minutes of the April 19, 1985 trustees' meeting, and (2) Plaintiffs are estopped from claiming that procedural deficiencies nullified the proposed amendment because Mr. Overby assertedly voted to adopt it as a member of NALC's Executive Council in 1985.[2] Both arguments miss the mark, however, because neither the Board of Trustees' asserted "adoption" nor the Executive Council's asserted "approval" could cure the absence of an actuarial evaluation and estimation. It is axiomatic that a deficiency can only be cured by the person(s) who have the power to cure, and here those persons were the actuaries.

Accordingly, the Court finds that Defendants failed to comply with at least the first step of the ATF's amendment procedure, and concludes that the ATF was never legally amended to substitute the "marriage-at-commencement" rule for the "one-year-at-death" rule. Therefore, the Court need not decide whether the proposed amendment was properly "adopted" by the trustees and "approved" by NALC's Executive Council, nor whether it violates any other provision of ERISA.

---

[2] Defendants waived an estoppel defense by failing to plead it. Estoppel is an affirmative defense that "must [be] affirmatively state[d]." Fed. R. Civ. P. 8(c)(1). Defendants failed to affirmatively state estoppel in their Answer. *See* Dkt. # 3. "[F]ailure to plead an affirmative defense generally waives the defense." *Camalier & Buckley-Madison, Inc. v. Madison Hotel, Inc.*, 513 F.2d 407, 420 n.92 (D.C. Cir. 1975).

## IV.  CONCLUSION

For the foregoing reasons, judgment is entered in favor of Plaintiffs. A memorializing Order accompanies this Memorandum Opinion.


DATE:  February 27, 2009                                /s/
                                                        ROSEMARY M. COLLYER
                                                        United States District Judge